[Nos. 48374-4, 48375-2. En Banc. December 22, 1982.]

THE STATE OF WASHINGTON, *Respondent*, v. DANIEL ELDON RICE, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. MONTE SANCHEZ, *Appellant*.

*Calvin C. Jackson* and *James M. Marshall,* for appellants.

*Don Herron, Prosecuting Attorney,* and *Mack E. Call* and *Kathleen M. Boyle, Deputies,* for respondent.

*Michael Mirra* on behalf of Evergreen Legal Services, amicus curiae for appellants.

PEARSON, J.—Defendants Daniel Rice and Monte Sanchez appeal the length of terms of confinement in disposition orders issued by the juvenile division of the Superior Court. The issues raised on appeal are twofold: first, whether the Legislature intended that juvenile dispositions under RCW 13.40 may include terms of confinement which exceed the maximum sentences allowed by RCW 9A.20.020; second, if the Legislature so intended, whether confining juveniles for periods longer than the maximum allowed for

adults violates the equal protection clauses of the United States and Washington Constitutions. We hold that the Legislature did not intend RCW 9A.20.020 to apply to juvenile dispositions, and that imposing longer terms of confinement on juveniles than on adults does not violate the requirement of equal protection.

Defendant Rice was adjudicated guilty in the juvenile division of the Pierce County Superior Court on July 6, 1981, of attempted criminal trespass, a misdemeanor. RCW 9A.52.070, 9A.28.020(3)(e).

At the disposition hearing on July 17, 1981, Rice's parole officer recommended a 52- to 65-week commitment. Rice had a history of prior offenses. He had been diverted from prosecution for third degree theft in June 1979 when he was 14 years of age. He did not complete the terms of his diversion agreement. He was convicted of third degree theft and possession of stolen property in September 1979, and sentenced to a term of community supervision. He violated the terms of his probation several times. In April 1980, he was convicted of second degree burglary and was sentenced to 52 weeks' detention. He was released from this detention on March 9, 1981 (having received leave for good behavior) and committed the present offense about 2 months later, on May 19, 1981. The parole officer reported that Rice was living at home with his mother, but that he was beyond control. He stole from his mother, lied to her, smoked marijuana, and failed to attend school. Rice's counsel conceded at the disposition hearing that the standard range disposition of 20 to 35 hours of community service or 3 months of community supervision was inadequate in light of the parole officer's report. However, he argued that Rice's sentence should be limited to the 90-day maximum allowed under RCW 9A.20.020 for an adult convicted of a misdemeanor. The court found a manifest injustice on Rice's recent criminal history, violations of the terms of prior dispositions, refusal to submit to supervision, and the other aggravating factors in the file. Rice was committed to the Department of Institutions for a period of 52 weeks.

Defendant Sanchez pleaded guilty on September 4, 1981, in the Pierce County Superior Court, juvenile division, to unlawful assault, a violation of the Pierce County Code, PCC 35.02.070, and a misdemeanor. The juvenile parole officer recommended a manifest injustice sentence and commitment to the Department of Institutions. Sanchez had a prior criminal history. In 1980, he was diverted from prosecution for possession of marijuana, and subsequently remanded to the juvenile court for violation of the terms of the diversion agreement. In June 1981, he was ordered to serve 1 year of community supervision and 120 hours of community service for three offenses, two of second degree burglary and one of first degree theft. At the time of the present offense, Sanchez was age 14 and living at home with his mother. He was 1 year behind in his schooling owing to serious absenteeism. His mother was incapable of controlling him, and he was unresponsive to the authority of officials at the juvenile detention facility. The court found that the standard range disposition of 10 to 20 days' detention, 80 to 110 hours' community service, and 1 year's community supervision was insufficient for the defendant. It ordered a manifest injustice sentence of 52 weeks' confinement; this was based on the short time since Sanchez' prior offense and his being still under community supervision at the time of the present offense, the lack of parental control, his failure to comply with a prior diversion agreement, and the fact that community supervision would not provide the structure necessary for his rehabilitation and correction.

Defendants argue that their terms of commitment on a finding of manifest injustice cannot exceed the maximum terms laid down in RCW 9A.20.020. This section sets out maximum sentences which may be imposed on persons convicted of offenses. The maximum sentence for a misdemeanor is 90 days' imprisonment or $1,000 fine or both. Defendants argue that this section applies to dispositions under the Juvenile Justice Act of 1977, RCW 13.40 (hereinafter JJA), as well as to adult criminal sentences. They

argue that the Legislature intended that RCW 9A.20.020 apply to all sentences, including juvenile dispositions. They argue further that the Legislature could not have legislated otherwise because to impose longer terms of confinement on children than on adults would violate the equal protection clauses of the United States and Washington Constitutions. We disagree. We hold that the Legislature did not intend RCW 9A.20.020 to apply to juvenile dispositions. And equal protection does not preclude the Legislature's mandating longer terms of confinement for children than for adults.

We begin our analysis with a very brief review of the history of our juvenile justice system, so as to place the present legislation in a historical perspective.

> The juvenile justice movement dates from the early nineteenth–century development of the prison system as a substitute for physical punishment. Under common law, a child below the age of seven could not be criminally prosecuted, while a youth between the ages of seven and fourteen was presumed to lack criminal capacity, a presumption only infrequently rebutted. Children above the age of fourteen bore full criminal responsibility, although punishment could always be mitigated. Prior to the nineteenth century, criminal punishment was swift and physical in nature, and imprisonment was unknown.
>
> In the absence of incarceration, the "mixing" of juvenile offenders with adults in common facilities was impossible. Equally, the absence of physical custody precluded the implementation of rehabilitative programs tailored to the young transgressor, the hallmark of the twentieth–century juvenile justice system.
>
> In the early nineteenth century, reforms led to the establishment of the prison system, resulting for the first time, in the incarceration of youths with more hardened adult criminals.

(Footnotes omitted.) Sobie, *The Juvenile Offender Act: Effectiveness and Impact on the New York Juvenile Justice System,* 26 N.Y. L. Sch. L. Rev. 677, 677–78 (1981).

It was in response to this result that the reforms which led to the juvenile court system were initiated.

> The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals. They were profoundly convinced that society's duty to the child could not be confined by the concept of justice alone. They believed that society's role was not to ascertain whether the child was "guilty" or "innocent," but "What is he, how has he become what he is, and what had best be done in his interest and in the interest of the state to save him from a downward career." . . . The idea of crime and punishment was to be abandoned. The child was to be "treated" and "rehabilitated" and the procedures, from apprehension through institutionalization, were to be "clinical" rather than punitive.

(Footnote omitted.) *In re Gault,* 387 U.S. 1, 15–16, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967).

This reform was embraced by the Legislature of this state, which enacted legislation in 1905 and 1909 to establish a juvenile court. In 1913 the Legislature enacted a more comprehensive juvenile court statute which was codified as RCW 13.04, and remained substantially unchanged until the present legislation was enacted in 1977. Becker, *Washington State's New Juvenile Code: An Introduction,* 14 Gonz. L. Rev. 289 (1979).

> In Washington, as elsewhere in the country, the stage was thus set for an era of what has been called "socialized justice" for juveniles. In contrast to its power in the adult criminal model, the juvenile court could obtain jurisdiction on the basis of a youngster's status rather than on the basis of his or her involvement in criminal acts. Legal rights were subordinated to judicial discretion, and punishment was "replaced" with individualized "treatment" plans. Justice was de–emphasized in order for the court to become an instrument for the diagnosis of social ailments and the delivery of social services.

(Footnote omitted.) 14 Gonz. L. Rev. at 291.

However, between the reformers' idea of socialized juvenile services and the reality of dealing with juvenile delinquents, there fell the shadow of failure. The juvenile justice system was failing the juveniles who were supposed to be

protected and rehabilitated by the system, and it was failing the public who were supposed to benefit from having children steered gently but firmly from a life of crime to a productive place in society. The United States Supreme Court pointed out some of the ways in which the system failed the juveniles who were subject to it.

> Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure. . . .
>
> Failure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy.

*In re Gault,* 387 U.S. at 18–20. Accordingly, the Court required basic rights of due process to be provided in juvenile proceedings. This represented a substantial modification of the informal, discretionary system that had existed previously. However, even with these safeguards, the juvenile system was still open to criticism that it did not deal fairly with young offenders, imposing penalties that were out of proportion to the seriousness of the offense. 14 Gonz. L. Rev. at 294–95.

At the same time, there was widespread feeling that the juvenile justice system was failing the public. This feeling was by no means peculiar to this state. The United States Congress recognized in the Juvenile Justice and Delinquency Prevention Act of 1974 that

> States and local communities which experience directly the devastating failures of the juvenile justice system do not presently have sufficient technical expertise or adequate resources to deal comprehensively with the problems of juvenile delinquency . . .

42 U.S.C. § 5601(a)(6) (1976).

The Senate report which was prepared following the hearing which led to the Juvenile Justice and Delinquency Prevention Act of 1974 emphasized the concern of the public at the failure of the juvenile justice system.

> It is essential that greater attention be given to serious youth crime, which has increased significantly in recent years. These children and youth are appropriate clients for the formal process of the juvenile justice system. A mugging victim does not care about the age of his or her assailant. The victim believes that it should not have happened and that something must be done. Juveniles constitute nearly half of the people arrested for the serious crime in this country, and the rate of increase outstrips that of adult arrests. The cost to the community is high in many ways. The amounts of money, time, life, property, resources, plus the emotional costs of fear, anger, confusion, and alienation are compelling reasons for the control of crimes committed by juveniles being a priority.

S. Rep. No. 1011, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad. News 5283, 5289.

The Juvenile Justice Act of 1977 is clearly an effort to overcome the inadequacies of the juvenile justice system. In this effort the Legislature has departed from wholehearted acceptance of the philosophy which impelled the old system. One of the prime sponsors of the new legislation wrote:

> In terms of the philosophical polarities that have characterized the juvenile court debate for more than a century, the new law moves away from the parens patriae doctrine of benevolent coercion, and closer to a more classical emphasis on justice. The law requires the court to deal more consistently with youngsters who commit offenses. The responsibility for providing services to youngsters whose behavior, while troublesome, is noncriminal, is assigned to the Department of Social and Health Services and the agencies with whom it may contract. The juvenile court is to view itself primarily as an instrument of justice rather than as a provider of services.

14 Gonz. L. Rev. at 307–08.

However, it would be a mistake to assume that the new legislation has turned completely from the ideal of rehabilitating juvenile offenders. The new legislation clearly does not set up a rigidly punitive system which mirrors in every respect the adult criminal justice system. This is particu-

larly true in the matter under consideration in this appeal, the disposition of the juvenile offender. The purposes underlying the juvenile system and the procedures designed to effect those purposes are significantly different from the purposes and procedures of the adult system.

That this is true, at least in respect to disposition or sentencing, can be shown by a comparison of statements of legislative purpose in the Sentencing Reform Act of 1981, RCW 9.94A, and the JJA. RCW 9.94A.010 provides that the purpose of the sentencing reform act is to

> make the criminal justice system accountable to the public by developing a system for the sentencing of felony offenders which structures, but does not eliminate, discretionary decisions affecting sentences, and to add a new chapter to Title 9 RCW designed to:
> (1) Ensure that the punishment for a criminal offense is proportionate to the seriousness of the offense and the offender's criminal history;
> (2) Promote respect for the law by providing punishment which is just;
> (3) Be commensurate with the punishment imposed on others committing similar offenses;
> (4) Protect the public;
> (5) Offer the offender an opportunity to improve him or herself; and
> (6) Make frugal use of the state's resources.

The purposes and policies underlying the JJA are rather more complex than these sentencing purposes in the adult criminal justice system. The formal statement of the intent of the Legislature in enacting the JJA is found in RCW 13.40.010(2). This provision states first the policies of the act, and second, the purposes of the act. The policies are twofold: to establish a system of having primary responsibility for, being accountable for, and responding to the needs of youthful offenders; and to hold juveniles accountable for their offenses.

The critical distinction here is that nowhere in RCW 9.94A.010, or anywhere else in the adult criminal justice system, is there expressed a policy of "responding to the needs" of offenders. Much less is such a policy stated as the

first of the two policies underlying the whole system. This legislative directive that the juvenile system respond to the needs of the offender is therefore one of considerable significance. It clearly indicates that the juvenile system is to some extent geared to respond to the needs of the child. Thus, while some of the 10 policies of the JJA are similar to the purposes of the adult system (*compare* RCW 13.40-.010(2)(a) *with* RCW 9.94A.010(4), and RCW 13.40-.010(2)(d) *with* RCW 9.94A.010(1)), others go beyond anything provided in the adult system. In particular, RCW 13.40.010(2)(f) and (j) both provide for treatment of juvenile offenders. Such "treatment" may be given in lieu of or in addition to punishment. RCW 13.40.010(2)(j). Nowhere in the statute is "treatment" defined; it is not limited to any particular kind of "treatment." The provision of "treatment" appears to be one way in which the system can respond to the needs of the juvenile offender, and the appropriate treatment would be determined by the nature of those needs.

Thus, while the JJA shares with the adult system the purposes of rendering a child accountable for his acts, punishing him and exacting retribution from him, such purposes are tempered by, and in some cases must give way to, purposes of responding to the needs of the child. In other words, the JJA has not utterly abandoned the rehabilitative ideal which impelled the juvenile justice system for decades. It does not embrace a purely punitive or retributive philosophy. Instead, it attempts to tread an equatorial line somewhere midway between the poles of rehabilitation and retribution.

The adult sentencing system, on the other hand, does not place such importance on rehabilitation. The fifth purpose of the Sentencing Reform Act of 1981 is to "[o]ffer the offender an opportunity to improve him or herself". Offering a chance of self-improvement does not suggest to us the same degree of commitment to rehabilitation as is expressed by the Legislature in the JJA. Punishment is the paramount purpose of the adult sentencing system.

We have previously recognized the dichotomy of purpose in the JJA. We noted in *In re Smiley*, 96 Wn.2d 950, 640 P.2d 7 (1982) that the JJA had replaced parens patriae as the single guiding principle of juvenile justice, with twin principles of rehabilitation and punishment. Therefore, in resolving any issue which turns on the legislative purpose of this act, we must ensure that our decision effectuates to the fullest possible extent both the purpose of rehabilitation and the purpose of punishment. *See also State v. Lawley*, 91 Wn.2d 654, 591 P.2d 772 (1979).

With this in mind, we turn to consider the provisions of the JJA which deal with the disposition of juvenile offenders. Any juvenile offender over whom jurisdiction is not declined (RCW 13.40.110) or who is not diverted from prosecution (RCW 13.40.070, .080) is subject to the juvenile court procedures. After a plea of guilty or a finding by the court that the prosecution has proved the allegations of the information beyond a reasonable doubt (RCW 13.40.130), a disposition hearing is held. RCW 13.40.150. For the purposes of disposition, the court may consider a wide variety of matters including aggravating and mitigating factors. In most cases the court is required to order a disposition within the standard range for the offense. RCW 13.40.160. The disposition standards are established by the juvenile disposition standards committee pursuant to RCW 13.40-.030. The standards establish ranges which may include either confinement or community supervision, or both, on the basis of a youth's age, the instant offense, and the history and seriousness of previous offenses. The statute provides both upper and lower limits on the standard range. Upper limits may not exceed that to which an adult may be subjected for the same offense. RCW 13.40.030(1)(a). And the minimum term may not be less than 50 percent of the maximum where the maximum is 90 days or less, 75 percent of the maximum where the maximum is 90 days to 1 year, and 80 percent of the maximum where the maximum is more than 1 year. RCW 13.40.030(5). In no event may the juvenile be committed by the juvenile court beyond his

21st birthday. RCW 13.40.300.

The court must in each case order a disposition within the limits established by the category of offender unless to do so would effectuate a "manifest injustice." RCW 13.40-.160. A manifest injustice is defined in RCW 13.40.020(12): "a disposition that would impose an excessive penalty on the juvenile or a clear danger to society in light of the purposes of this chapter". It is this concept of manifest injustice which is central to the issues before us. The statute clearly requires in RCW 13.40.030(1)(a) that the standard range of disposition may not exceed the adult maximum specified in RCW 9A.20.020. But the court may exceed the standard range maximum where necessary to avoid "a clear danger to society in light of the purposes of" the JJA. RCW 13.40.020(12). The issue is, therefore, whether the adult maximum of RCW 9A.20.020 applies to the manifest injustice disposition as well as to the disposition standards.

The Legislature has manifested its intent that RCW 9A.20.020 should not apply to manifest injustice juvenile dispositions. RCW 13.04.450 provides

> The provisions of chapters 13.04 and 13.40 RCW, as now or hereafter amended, shall be the exclusive authority for the adjudication and disposition of juvenile offenders except where otherwise *expressly* provided.

(Italics ours.) In only one place does RCW 13.04 or 13.40 *expressly* provide that the maximum sentences in RCW 9A.20.020 shall apply to the disposition of juvenile offenders. This is RCW 13.40.030(1)(a), which provides the upper limit on the standard range of dispositions. But this provision does not apply to dispositions outside the standard range. There being no express provision that RCW 9A.20.020 apply to dispositions outside the standard range, RCW 13.04.450 clearly requires that RCW 13.40 be the exclusive authority for the disposition of juvenile offenders. And RCW 13.40 does not provide that "manifest injustice" dispositions outside the standard range be limited to the terms provided by RCW 9A.20.020. The plain meaning of RCW 13.04.450 and RCW 13.40 is therefore that RCW

9A.20.020 does not apply to juvenile dispositions.

This result is consistent with the legislative intent that underlies RCW 13.40. As we have discussed, rehabilitation is one of the purposes of the JJA, and in certain cases commitments in excess of the maximum provided for adults may be necessary to respond to the needs of the juvenile offender. The cases before us are good examples. Both defendants have records of prior offenses; indeed, the records before us convince us that both defendants are in clear danger of becoming adult offenders unless rehabilitation is effective. A number of factors common to both defendants' histories suggests that a term of confinement longer than the adult maximum is essential to any reasonable attempt to prevent these defendants from reoffending. In each case, the record indicates a lack of parental control over the juvenile. The structured and disciplined environment of detention can be beneficial to such children if the children are exposed to that environment for sufficient duration. A second common factor is that both defendants are substantially behind their peers in school work. In detention, juveniles are provided with education services. We recently recognized the need of juvenile detainees for such services in *Tommy P. v. Board of Cy. Comm'rs,* 97 Wn.2d 385, 645 P.2d 697 (1982). The availability of education in detention reinforces the rehabilitative aspect of juvenile dispositions and contributes to the benefits that a juvenile may receive from detention. Third, both defendants had some involvement with controlled substances, and confinement may keep such temptations beyond their reach, at least temporarily. It can only be hoped that the positive benefits of detention would then help the defendants resist such temptations upon their return to society. Finally, both defendants have extensive criminal records and previous attempts to reform them were inefficacious. Rice reoffended 2 months after being released from detention; Sanchez reoffended while still under community supervision for his previous offenses. Clearly, both defendants are in need of more prolonged detention than the 90

days' maximum which they urge us to apply.

If we were to apply the adult maximum to the disposition provisions of the JJA, we would leave the juvenile courts without a means of responding to the obvious needs of juveniles like the defendants. It would be, in effect, telling the juvenile court to ignore the needs of the juvenile until he is convicted of committing an even more serious offense. Such an approach is necessary under the adult system in which punishment is the paramount purpose and where the punishment must fit the crime. But it is inimical to the rehabilitative purpose of the juvenile justice system. It would destroy the flexibility the Legislature built into the system to allow the court, in appropriate cases, to fit the disposition to the offender, rather than to the offense.

Accordingly, we conclude that both the language and the purpose of the JJA require that the adult maximum sentence does not apply to juvenile dispositions under the manifest injustice provisions.

Defendants' arguments relied heavily on a statement by this court in *State v. Rhodes,* 92 Wn.2d 755, 600 P.2d 1264 (1979). In that case, we upheld the "manifest injustice" exception to the standard range disposition against a challenge on the grounds that it was unconstitutionally vague. We held that a sufficient definition of "manifest injustice" was contained in the statute to guide the court in sentencing juvenile offenders.

> The legislative intent in enacting the juvenile code is set forth in RCW 13.40.010(2). In addition to the purposes set out in this section, there are other standards in the statute which prevent arbitrary and discriminatory application of the manifest injustice exception. RCW 13.40.030(1) provides that any period of confinement and supervision must not exceed that to which an adult may be subjected for the same offense. RCW 13.40.300 limits the sentencing period so that no confinement can extend beyond the offender's 21st birthday. RCW 13.40-.150(2)(h), (i) set forth aggravating and mitigating factors to be considered by the court at a disposition hearing. . . . Moreover, the court is not limited to consideration

> of these factors. Evidence such as probation officers' reports and psychological and psychiatric studies is available to the court to assist it in determining whether a clear danger to society exists. RCW 13.40.150(1).

(Citations omitted.) 92 Wn.2d at 759. We construed the provisions of RCW 13.40.030(1) differently in *Rhodes* than we do today. We said in *Rhodes* that the adult maximums did apply to manifest injustice sentences. We hold here that they do not. The reason is that since *Rhodes* was decided the Legislature has enacted RCW 13.04.450, restricting the applicability of general criminal provisions to the juvenile justice system. Our authority is circumscribed absent express legislative direction. Therefore we construe RCW 13.40.030(1) in the way RCW 13.04.450 now requires. The defendants' reliance on *Rhodes* is misplaced.

Nor does our holding in the present case affect the validity of the manifest injustice exception. Even without being limited to the adult maximums, the manifest injustice exception is not vague. The manifest injustice standard cannot be applied arbitrarily or discriminatorily. It can be used only to impose a disposition beyond the standard maximum when there is a clear danger to society in light of the purposes of the act. The purposes of the act are set out in RCW 13.40.010(2). The court may consider a wide variety of factors to determine whether such a clear danger exists. RCW 13.40.150(1), (2). It must set forth in writing the reasons for finding a manifest injustice and any disposition outside the standard range is appealable. RCW 13.40.160. In order to uphold a disposition outside the standard range, the appellate court must find that the reasons supplied by the disposition judge are supported by the record, and that those reasons clearly and convincingly support the conclusion that a disposition within the standard range would constitute a manifest injustice. RCW 13.40.230(2). The manifest injustice standard, therefore, meets the requirements set forth in *Rhodes,* even after our holding in this case.

We turn now to consider the second issue raised on this

appeal, whether confining juveniles for longer than the maximum sentence provided for adults violates state or federal requirements of equal protection. Essentially, defendants argue that by subjecting juveniles to periods of confinement longer than those provided for adults for the same offense, the JJA denies juveniles the equal protection guaranteed by the fourteenth amendment to the United States Constitution and article 1, section 12 of the state constitution.

At the outset of any equal protection analysis, it is necessary to define the standard of review against which to test the challenged legislation. *State v. Smith,* 93 Wn.2d 329, 610 P.2d 869 (1980). Two tests are used to judicially measure classifications alleged to violate equal protection: the strict scrutiny and the rational relationship tests. *Smith.* The strict scrutiny test is used if the statutory classification attacked as discriminatory under the equal protection clause involves a "suspect" class or involves a "fundamental right" explicitly or implicitly guaranteed by the United States Constitution. When strict scrutiny is involved, the classification will be upheld only if the State makes a showing of a compelling state interest to justify the classification. *Darrin v. Gould,* 85 Wn.2d 859, 540 P.2d 882 (1975).

As we pointed out in *Houser v. State,* 85 Wn.2d 803, 805, 540 P.2d 412 (1975), age discriminations are not inherently "suspect," and therefore the Legislature's differential treatment of juveniles does not in this case create a suspect class so as to require strict scrutiny of the classification. However, the interest involved in the classification is one which is fundamental. It is nothing less than the juveniles' right to liberty. This is a right which is explicitly preserved in both the fourteenth amendment to the United States Constitution and the constitution of this state, article 1, section 3. The Supreme Court of the United States has recognized as fundamental the right to vote, freedom of expression, and the right to procreation. *See Darrin v. Gould,* at 866. None of these rights have any meaning in the absence of liberty, the freedom from physical restraint.

Accordingly, we recognize the individual's interest in liberty is a fundamental right for the purpose of equal protection analysis. *People ex rel. Wayburn v. Schupf,* 39 N.Y.2d 682, 350 N.E.2d 906, 385 N.Y.S.2d 518 (1976).

Therefore, the appropriate standard of review to be applied in this case is the strict scrutiny test. We have recently stated this test as follows:

> The enactment will not be upheld unless the state establishes a compelling interest. And, to do so, the state must show its purpose or interest in the enactment is both constitutionally permissible and substantial, and that use of the classification is necessary to the accomplishment of its interest.

*Nielsen v. State Bar Ass'n,* 90 Wn.2d 818, 820, 585 P.2d 1191 (1978). We find that the State has satisfied this test.

The State's purpose and interest in the confinement of juvenile offenders is at least in part to achieve some measure of rehabilitation. This is clearly constitutionally permissible. *McKeiver v. Pennsylvania,* 403 U.S. 528, 29 L. Ed. 2d 647, 91 S. Ct. 1976 (1971). It is also a substantial interest as is cogently stated in the Task Force on Juvenile Delinquency, President's Comm'n on Law Enforcement & Admin. of Justice, *Juvenile Delinquency and Youth Crime* 9 (1967) (quoted in *McKeiver,* 403 U.S. at 546 n.6).

> That willingness to understand and treat people who threaten public safety and security should be nurtured, not turned aside as hopeless sentimentality, both because it is civilized and because social protection itself demands constant search for alternatives to the crude and limited expedient of condemnation and punishment.

The Task Force report recognized the importance of the rehabilitative function to the juvenile justice system.

> Rehabilitating offenders through individualized handling is one way of providing protection [for society], and appropriately the primary way in dealing with children. . . . What should distinguish the juvenile from the criminal courts is greater emphasis on rehabilitation, not exclusive preoccupation with it.

*Juvenile Delinquency and Youth Crime,* at 9.

We have discussed earlier in this opinion the reason we consider that, in certain cases, confinement in excess of the adult maximum is necessary to achieve the State's substantial purpose of rehabilitating juvenile offenders. Therefore, we find that the State has satisfied the strict scrutiny test. The provision for confinement of juveniles in excess of the maximum terms for adults does not violate the state or federal equal protection clauses.

We have considered the other issues raised by defendant Sanchez and find them to be without merit. Accordingly, we affirm the disposition orders of the Superior Court.

Brachtenbach, C.J., and Rosellini, Stafford, Utter, Dolliver, Williams, and Dimmick, JJ., concur.

Dore, J. (dissenting)—Daniel Rice was a 16-year-old juvenile who was found guilty of criminal trespass in the first degree, a misdemeanor. The other defendant, 13-year-old Monte Sanchez, pleaded guilty to unlawful assault, also a misdemeanor. If the juveniles had been adults, the maximum sentence they could have received would have been *90 days*. Because they were juveniles, however, the court sentenced them to confinement in a correctional institution for *1 year*. The majority, by its opinion, sanctions this unconstitutional sentence. I would remand, with instructions to reduce the sentence to 90 days.

I

Traditional rules of statutory construction require that the court ascertain and give effect to the intent and purpose of the Legislature as expressed in the act. *State v. Eilts*, 94 Wn.2d 489, 493, 617 P.2d 993 (1980). The stated purpose of the Legislature in enacting the Juvenile Justice Act of 1977 (Juvenile Justice Act) is set forth in RCW 13.40.010:

(2) It is the intent of the legislature that a system capable of having primary responsibility for, being accountable for, and responding to the needs of youthful offenders, as defined by this chapter, be established. It is

the further intent of the legislature that youth, in turn, be held accountable for their offenses and that both communities and the juvenile courts carry out their functions consistent with this intent. To effectuate these policies, it shall be the purpose of this chapter to:

(a) Protect the citizenry from criminal behavior;

(b) Provide for determining whether accused juveniles have committed offenses as defined by this chapter;

(c) Make the juvenile offender accountable for his or her criminal behavior;

(d) Provide for punishment commensurate with the age, crime, and criminal history of the juvenile offender;

(e) Provide due process for juveniles alleged to have committed an offense;

(f) Provide necessary treatment, supervision, and custody for juvenile offenders;

(g) Provide for the handling of juvenile offenders by communities whenever consistent with public safety;

(h) Provide for restitution to victims of crime;

(i) Develop effective standards and goals for the operation, funding, and evaluation of all components of the juvenile justice system and related services at the state and local levels; and

(j) Provide for a clear policy to determine what types of offenders shall receive punishment, treatment, or both, and to determine the jurisdictional limitations of the courts, institutions, and community services.

Among the enumerated statements of legislative purpose, RCW 13.40.010(2)(d) emphasizes that the act is designed to "[p]rovide for punishment commensurate with the age, crime, and criminal history of the juvenile offender".[1] This

---

[1]State Representative Mary Kay Becker, a prime sponsor of House Bill 371, 45th Legislature, which became the Juvenile Justice Act of 1977, has written extensively about the act and how it differs from the former juvenile act of 1913. In an article in the Gonzaga Law Review, Becker summarized the philosophical difference between the old act and the new.

> From this narrative the broad purposes of House bill 371 should be fairly clear. In terms of the philosophical polarities that have characterized the juvenile court debate for more than a century, the new law moves away from the parens patriae doctrine of benevolent coercion, and closer to a more classical emphasis on justice. The law requires the court to deal more consistently with youngsters who commit offenses. The responsibility for providing services to youngsters whose behavior, while troublesome, is noncriminal, is assigned to

expression of legislative purpose certainly does not contemplate a statutory scheme of punishment which would allow incarceration of a 15-year-old juvenile offender until his 21st birthday for the offense of attempted criminal trespass in the first degree, while a similarly situated 18-year-old codefendant would be subjected only to a maximum penalty of 90 days in jail. Such an incongruous scenario is possible if RCW 9A.20.020 does not set the maximum sentence for a juvenile offender.

Perhaps the most persuasive evidence of legislative intent is found in RCW 13.40.030(1)(a), which authorizes the establishment of disposition standards for juvenile offenders:

> The standards shall establish, in accordance with the purposes of this chapter, ranges which may include terms of confinement and/or community supervision established on the basis of a youth's age, the instant offense, and the history and seriousness of previous offenses, *but in no case may the period of confinement and supervision exceed that to which an adult may be subjected for the same offense(s).*

(Italics mine.)

In *State v. Rhodes,* 92 Wn.2d 755, 759, 600 P.2d 1264 (1979), we pointed to the language of RCW 13.40.030(1) as evidence that the manifest injustice exception is not unconstitutionally vague:

> The legislative intent in enacting the juvenile code is set forth in RCW 13.40.010(2). In addition to the purposes set out in this section, *there are other standards in the statute which prevent arbitrary and discriminatory application of the manifest injustice exception. RCW 13.40.030(1) provides that any period of confinement and supervision must not exceed that to which an adult may be subjected for the same offense.* RCW 13.40.300 limits the sentencing period so that no confinement can

---

the Department of Social and Health Services and the agencies with whom it may contract. The juvenile court is to view itself primarily as an instrument of justice rather than as a provider of services.

Becker, *Washington State's New Juvenile Code: An Introduction,* 14 Gonz. L. Rev. 289, 307-08 (1979).

> extend beyond the offender's 21st birthday.

(Italics mine.)

Additionally, the appellate courts of our state have applied adult criminal statutes to juvenile court proceedings on a consistent basis. In *State v. Norton,* 25 Wn. App. 377, 380, 606 P.2d 714 (1980), the Court of Appeals held that RCW 10.22, the compromise of misdemeanors statute, applies to juvenile court proceedings. The court, in giving effect to the intent of the Legislature, reasoned:

> The essence of the compromise of misdemeanors statute is restitution to crime victims and *avoidance of prosecution for minor offenders. These functions are consistent with the purposes of the Juvenile Justice Act of 1977, specifically RCW 13.40.010(2)(g) and (h). Because the purposes of the two statutes are consistent,* we hold that where, as here, an offense designated a misdemeanor under the adult criminal statutes is used to invoke the jurisdiction of the juvenile court, the compromise of misdemeanors statute, RCW 10.22, may be applied in juvenile proceedings.

(Footnote omitted. Italics mine.)

In *State v. Bird,* 95 Wn.2d 83, 89, 622 P.2d 1262 (1980), the Supreme Court held that RCW 9.92.060, which grants to trial courts the authority to suspend sentences, is applicable in juvenile court proceedings. In its opinion, the court cited with approval the rationale of the Court of Appeals in *State v. Norton, supra:*

> The same analysis is applicable here. The purpose of a suspended sentence is to order an appropriate disposition with clear conditions, which, if violated, empowers the court to commit the offender. Among the purposes of RCW 13.40 are to:
>
> > (d) Provide for punishment commensurate with the age, crime, and criminal history of the juvenile offender;
> >
> > . . .
> >
> > (g) Provide for the handling of juvenile offenders by communities whenever consistent with public safety;
>
> RCW 13.40.010(2)(d) and (g). *A suspended sentence is consistent with these purposes. In the absence of language to the contrary, therefore, the reasoning of Norton*

*permits the trial court to suspend sentences under RCW 13.40.*

(Citation omitted. Italics mine.)

The analysis contained in *Norton* and *Bird* is also applicable in the present case. The purpose of RCW 9A.20.020 is to set a maximum term of punishment for misdemeanor offenses. This is consistent with the stated purpose of the Legislature to provide a clear policy to determine the jurisdictional limitations of the courts. RCW 13.40.010(2)(j).

In *Bird,* at page 90, we relied upon two rules of statutory construction peculiar to criminal statutes: First, a literal interpretation must be given to criminal statutes. Second, the "rule of lenity" is applicable to problems of statutory construction of criminal statutes. Under the "rule of lenity," the court will not interpret a criminal statute so as to increase the penalty imposed absent clear evidence of legislative intent to do so. *In re Carle,* 93 Wn.2d 31, 33, 604 P.2d 1293 (1980).

Read literally, RCW 13.40 contains no clear indication of legislative intent to allow a trial court to incarcerate a juvenile offender for a term greater than an adult could receive for the same offense. On the contrary, such an interpretation conflicts with the purpose of the Juvenile Justice Act as set forth in RCW 13.40.010(2)(d) and (j). In the absence of any clear expression of legislative intent to the contrary, this court is required under the rule of lenity to recognize the applicability of RCW 9A.20.020 to RCW 13.40.

Since RCW 9A.20.020 does not conflict with the purpose of RCW 13.40 as stated in RCW 13.40.010(2), nor with the purpose of the manifest injustice exception of RCW 13.40, RCW 9A.20.020 should be applicable to the present case.

II

In *Reanier v. Smith,* 83 Wn.2d 342, 517 P.2d 949 (1974), we held that a sentence, pursuant to RCW 9.95.060, does not begin to run until the convicted person is in custody following the judgment and sentence. The constitutional concepts of due process and equal protection and the pro-

hibition against multiple punishments require that an accused person's detention prior to conviction be credited against the maximum and mandatory minimum sentence established by statute.

In *Reanier,* Justice Hamilton stated at pages 346–47:

> Fundamental fairness and the avoidance of discrimination and possible multiple punishment dictate that an accused person, unable to or precluded from posting bail or otherwise procuring his release from confinement prior to trial should, upon conviction and commitment to a state penal facility, be credited as against a maximum and a mandatory minimum term with all time served in detention prior to trial and sentence. Otherwise, such a person's total time in custody would exceed that of a defendant likewise sentenced but who had been able to obtain pretrial release. . . . Aside from the potential implications of double jeopardy in such a situation, it is clear that the principles of due process and equal protection of the law are breached without rational reason.

(Footnote omitted.)

In *In re Trambitas,* 96 Wn.2d 329, 635 P.2d 122 (1981) we applied the rationale of *Reanier v. Smith, supra,* to juveniles, saying that due process and equal protection guaranties require that a juvenile's detention prior to disposition be credited against the maximum term of confinement imposed under the standard range guidelines. We stated in *Reanier* that pretrial detention time served by adults must be credited against maximum and mandatory minimum terms to avoid constitutional violations. I see no reason to deny similar protection to juveniles.

III

Juveniles are entitled to equal protection of the laws with regard to sentencing. The new Juvenile Justice Act shifts policy considerations from an emphasis on rehabilitation to an emphasis on accountability, punishment, and the protection of society.[2] Consequently, juvenile offenders, espe-

---

[2]The majority in *State v. Lawley,* 91 Wn.2d 654, 656, 591 P.2d 772 (1979), although denying juveniles the right to a jury trial, recognized the shift, as did the dissent in that case. *State v. Rhodes,* 92 Wn.2d 755, 600 P.2d 1264 (1979), as dis-

cially those sentenced under a declaration of manifest injustice, are similarly situated to their adult counterparts for purposes of sentencing.

Allowing juveniles sentenced under the Juvenile Justice Act to receive longer terms of incarceration than could be imposed on adults for the same offense does not promote a compelling state interest and is, therefore, in violation of Const. art. 1, § 12.

Assuming the right involved is not fundamental, in order to satisfy minimal scrutiny under the equal protection clause, a statutory classification must at the very least rationally promote a valid government purpose. *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 33–40, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973); *Darrin v. Gould,* 85 Wn.2d 859, 866, 540 P.2d 882 (1975).

The purposes of the Juvenile Justice Act are many and varied and arguably very similar to the purposes of sentencing adults in this state. The obvious purpose of the manifest injustice exception, however, is the protection of society. RCW 13.40.020(12); RCW 13.40.160. While this is certainly a valid government objective, there is no rational reason for sentencing juvenile offenders to longer terms of incarceration than could be imposed on adults convicted of the same offense, unless the basic theory of the act in general and the manifest injustice exception in particular is rehabilitative. If the objective of the sentencing is accountability, and punishment commensurate with the offense and the protection of society, there is no rational basis for determining that a juvenile, simply by reason of his age, should be subject to a term of incarceration longer than the

---

cussed earlier, clearly recognizes this shift.

In *In re Erickson,* 24 Wn. App. 808, 604 P.2d 513 (1979), the Court of Appeals found RCW 13.40 to be so similar to adult criminal statutes as to constitute punishment for crime sufficient to fall within the constitutional exception to involuntary servitude.

In *In re Frederick,* 93 Wn.2d 28, 604 P.2d 953 (1980), the Supreme Court held that a juvenile could not be convicted of first degree escape under RCW 9A.76.110 because a juvenile could not literally be convicted of a felony.

adult maximum for the same offense.

In *People v. Olivas,* 17 Cal. 3d 236, 551 P.2d 375, 131 Cal. Rptr. 55 (1976), the California Supreme Court voided a statute that allowed the incarceration of youths between 16 and 21 years of age for terms that were longer than the maximum imposed on adults. An extensive review of the historical and judicial basis for the liberty interest led the court to conclude that personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions.

Even assuming that the State provides substantial "treatment" benefits to juveniles, the Washington court has rejected the proposition that these benefits sufficiently compensate a juvenile for the loss of liberty to dispense with the need for strict scrutiny. A juvenile still shares with an adult offender the one feature that overwhelms the differences between their circumstances—they are both incarcerated against their will. While conceding the rehabilitation purposes of the Washington juvenile system even in 1976, the Supreme Court said:

> However, where a restraint of liberty is involved, the fact of the beneficent, civil nature of the juvenile code loses its significance. Although the proceedings may be deemed "civil," "rehabilitative," or "remedial," they are subject to the same strict constitutional scrutiny they would be if they were deemed "criminal" proceedings.

*Johnson v. Morris,* 87 Wn.2d 922, 929, 557 P.2d 1299 (1976). The United States Supreme Court made the same point. "It is incarceration against one's will, whether it is called 'criminal' or 'civil.'" *In re Gault,* 387 U.S. 1, 50, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967). *See also Breed v. Jones,* 421 U.S. 519, 44 L. Ed. 2d 346, 95 S. Ct. 1779 (1975); *People v. Olivas, supra; Vann v. Scott,* 467 F.2d 1235 (7th Cir. 1972). The State's allegation of available treatment benefits should not divert the court's attention from this primary feature of incarceration, whether juvenile or adult.[3]

---

[3]The State, in the present case, repeatedly cites *State v. McCarter,* 17 Wn. App. 319, 562 P.2d 995 (1977) as an example of a court's use of the rational basis

IV

In *State v. Rhodes*, 92 Wn.2d 755, 600 P.2d 1264 (1979), we recognized that a statute is void for vagueness if it fails to provide explicit standards to prevent arbitrary and discriminatory enforcement.

Analyzing the Juvenile Justice Act under the void–for–vagueness test, we held that the act as a whole, and the manifest injustice exception in particular, contained sufficient mandatory sentencing standards to prevent arbitrary and discriminatory enforcement. In reaching its decision, this court relied in part on RCW 13.40.030(1)(a), which provides that "in no case may the period of confinement and supervision exceed that to which an adult may be subjected for the same offense(s)". Under the analysis of *Rhodes*, this limitation clearly should be applied to all juveniles, including those sentenced under a declaration of manifest injustice.

In the case at bar, the State urges that the only absolute limitation upon the length of a juvenile's sentence outside of the standard range is his or her 21st birthday. The maximum sentence for each juvenile convicted of any offense would then be arbitrarily and discriminatorily determined by the juvenile's age alone, with the result that the younger the child, the more severe the maximum sentence. The potential maximum sentence would in no way correlate to the severity of the current offense nor the juvenile's crimi-

---

test in a case involving the loss of liberty. McCarter was incarcerated at Western State Hospital in its sexual psychopathy program, pursuant to RCW 71.06. The issue was whether his continued incarceration and treatment beyond the expiration of the maximum sentence on his underlying offense, without further commitment hearings, denied him the equal protection of the law. The Court of Appeals held that it did not. The State cites the Court of Appeals holding for the proposition that strict scrutiny is not an appropriate standard of judicial review when the State's deprivation of liberty is for treatment purposes. However, the State has *failed to note that, on further review,* the Supreme Court reversed the Court of Appeals. *State v. McCarter,* 91 Wn.2d 249, 588 P.2d 745 (1978). The case actually stands for the contrary proposition—that liberty is fundamental and that the court will strictly scrutinize its deprivation, even if the State's purposes are rehabilitative and even if the incarceration occurs in a hospital or other "nonpenal" setting that, presumably, does not share the rigors of Washington's adult prisons.

nal history as required by RCW 13.40.010(2)(d). Under the analysis of *Rhodes,* such arbitrary and discriminatory determination of punishment would cause the statute to be unconstitutionally void for vagueness.

### Conclusion

Examination of the Juvenile Justice Act and case law interpreted in its various provisions clearly demonstrates that the Legislature did not intend to vest the juvenile court with the power to incarcerate a juvenile offender for a term greater than that which an adult could receive for the same offense. By ordering Daniel Rice and Monte Sanchez to prison for 1 year, the trial court arbitrarily exceeded its authority under RCW 13.40, and rendered sentences four times that of an adult for the same offense. Further, I don't believe the United States and Washington State Constitutions can tolerate a situation where an 18–year–old boy, convicted of a misdemeanor carrying a minimum jail term of 90 days, can be sentenced to 90 days, while a boy 1 day younger, convicted of a similar misdemeanor, can be sentenced to a confinement period of 1 year, or four times longer. This constitutes a violation of due process and equal protection. The defendants, Rice and Sanchez, cannot constitutionally be sentenced to more than 90 days.

I would reverse and remand to the trial court and sentence each defendant to not more than 90 days' confinement.