## NOTICE:   SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 15, 2021

*Susan L. Carlson*
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 96894-2 |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| M.S., | ) | |
| | ) | |
| Petitioner. | ) | |
| | ) | Filed: April 15, 2021 |

JOHNSON, J.—This case involves the issue of whether a juvenile, before entering a guilty plea in a criminal proceeding, has a statutory or constitutional due process right to notice of the factual basis of and the intent to seek a manifest injustice disposition. The trial court in this case sentenced M.S., a juvenile, to a manifest injustice disposition based on facts and aggravating factors that M.S. had no notice of at the time of his plea. The Court of Appeals affirmed M.S.'s sentence and rejected M.S.'s argument that any right to notice of the factual basis of a

*State v. M.S.*, No. 96894-2

manifest injustice disposition exists prior to pleading guilty.[1] We reverse the Court

of Appeals and hold that a juvenile has a right to notice of the factual basis

necessary to support a manifest injustice sentence before deciding to plead guilty.[2]

FACTS AND PROCEDURAL HISTORY

In November 2017, M.S. was charged with third degree assault of a King

County Metro bus driver. M.S. approached the driver's side window of a King

County bus while it was parked. When the bus driver leaned out the driver's side

window to speak to M.S., M.S. squirted urine from a plastic bottle at the bus

driver. M.S. then threw the plastic bottle into the bus, where it hit the driver and

further covered the driver with urine. The driver threw the bottle out of the bus,

and M.S. tossed the bottle at the front windshield of the bus.

M.S. pleaded guilty to a reduced charge of fourth degree assault and

requested a deferred disposition of the criminal assault charge. During M.S.'s plea

colloquy, the court discussed with M.S. the meaning of a deferred disposition and

the constitutional rights M.S. was waiving. The court noted that it could revoke the

---

[1] The Juvenile Law Center, the Fred T. Korematsu Center for Law and Equality and TeamChild, and the American Civil Liberties Union of Washington and King County Department of Public Defense filed amici briefs in this case in support of M.S.

[2] Because M.S.'s sentence has been fully served, his case is moot. *State v. B.O.J.,* 194 Wn.2d 314, 321, 449 P.3d 1006 (2019). However, we granted review in this case and in *State v. D.L.*, No. 96143-3 (Wash. Apr. 15, 2021), https://www.courts.wa.gov/opinions, to resolve whether a juvenile must be provided notice of facts that could form the basis of a manifest injustice disposition at the time a juvenile pleads guilty. We therefore decide this case without modifying M.S.'s sentence, and we consider only the two issues M.S. raises.

2

*State v. M.S.*, No. 96894-2

disposition and then sentence M.S. The court explained the standard range for M.S.'s crime.[3] The court also asked M.S. if he understood that the court could impose a manifest injustice sentence outside the standard range if it found aggravating factors.[4] The court did not mention at the hearing or in the plea agreement any existing aggravating factors it could rely on if it did impose a manifest injustice sentence.

The court granted M.S.'s request for a deferred disposition on January 3, 2018, and in it required M.S. to comply with a number of conditions of community supervision. The order required M.S. to attend and participate in the case management process and to meet with his juvenile probation counselor (JPC). It required that M.S. live in a placement approved by the Department of Social and Health Services,[5] given that M.S. was a dependent child, and required that M.S. comply with a curfew set by his JPC or treatment provider. The order also required M.S. to attend school or a GED (general equivalency diploma) program without

---

[3] Fourth degree assault carries a standard range of 0 to 12 months of community supervision, 0 to 150 hours of community service, a $0 to $500 fine, 0 to 30 days of detention, and the possibility of restitution.

[4] "THE COURT: I'd be required to sentence you within that standard range unless I found special circumstances or what we call aggravating factors that made that standard range sentence what we call a manifest injustice, do you understand that?
"THE RESPONDENT: Yes." Verbatim Report of Proceedings (Jan. 3, 2018) at 14.

[5] Effective July 1, 2018, the newly created Department of Children, Youth, and Families took over child welfare duties that were formerly the responsibility of the Department of Social and Health Services. RCW 43.216.906.

3

disciplinary issues; prohibited M.S. from using, possessing, or consuming alcohol or other controlled substances without a prescription; required M.S. to complete counseling, treatment, and classes at the direction of the JPC; and required M.S. to complete random urinalysis (UA) tests.

M.S. was placed in Cypress House, which is a therapeutic group home for juveniles with behavioral issues. M.S. was unable to comply with the conditions of community supervision. On March 22, 2018, the court held a hearing and found that M.S. failed to go to scheduled appointments with his JPC, to comply with curfew restrictions, to attend school, and to provide random UAs. The court imposed a sanction of 10 days of detention. It did not revoke M.S.'s deferred disposition, and it gave M.S. another opportunity to comply with the conditions of community supervision.

M.S.'s behavior did not improve after his 10-day detention. After being released from detention, M.S. used drugs and alcohol, and he brought drugs and drug paraphernalia into Cypress House. He brought weapons into Cypress House and threatened and assaulted his peers and the staff. M.S. was unable to comply with curfew restrictions, although he was making improvements. Based on his behavior, Cypress House requested his removal because of the danger M.S. posed to his peers and the staff.

Both the JPC and the State requested that M.S.'s deferred disposition be revoked. The State further recommended a manifest injustice disposition above standard range to be served in the Juvenile Rehabilitation Administration (JRA). The court revoked the deferred disposition based on M.S.'s failure to participate in and comply with the case management process. The court then imposed a manifest injustice disposition of 52 weeks. The court found five aggravating factors supported the manifest injustice sentence: (1) high risk to reoffend, (2) inability of M.S.'s supervisors to control him, (3) M.S.'s treatment needs that could not be addressed in the community, (4) failure to comply with court orders, and (5) the unjust leniency of the standard range.

M.S. appealed his manifest injustice disposition, arguing that the trial court erred by considering prohibited and nonstatutory aggravating factors and, secondarily, that he was denied constitutional due process to notice at the time of his charging and plea of the specific aggravating factors that could support a manifest injustice disposition.

The Court of Appeals commissioner rejected these challenges and affirmed the manifest injustice disposition. The commissioner concluded that M.S. had waived his argument regarding the use of nonstatutory aggravating factors because he had not raised that issue in the trial court. But the commissioner noted that

*State v. M.S.*, No. 96894-2

courts are allowed to consider nonstatutory aggravating factors in imposing

manifest injustice dispositions.

The commissioner rejected the argument that *Apprendi v. New Jersey*, 530

U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Blakely v. Washington*,

542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), required notice of

aggravating factors supporting a manifest injustice disposition at the time of the

guilty plea. The commissioner further reasoned that *State v. Siers,* 174 Wn.2d 269,

274 P.3d 358 (2012), which held that adult criminal defendants must have

constitutionally adequate notice of aggravating factors even though they need not

be in the charging document, was inapposite. The commissioner concluded that no

due process violation existed and affirmed the trial court. M.S. then sought

discretionary review in this court, which we granted.

ANALYSIS

I.    Statutory Scheme

In this case, it is useful to first provide an overview of the statutory scheme

governing deferred dispositions for juveniles charged with criminal behavior.

Where a juvenile agrees to a deferred disposition, they must acknowledge "the

[police] report will be entered and used to support a finding of guilt and to impose

a disposition if the juvenile fails to comply with terms of supervision" and "the

direct consequences of being found guilty and the direct consequences that will

6

happen if an order of disposition is entered." RCW 13.40.127(3)(b), (d). In

deferring dispositions, the court is required to put the juvenile under conditions of

community supervision. RCW 13.40.127(5). The prosecutor may move to revoke

the deferred disposition and enter an order of disposition if the juvenile fails to

comply with the conditions of supervision. RCW 13.40.127(7)(a)-(b). The deferred

disposition may result in a dismissal if certain requirements are met. RCW

13.40.127(9)(a).

Where a deferred disposition is revoked, the statute provides the court with

four options to sentence juveniles pursuant to an order of disposition. RCW

13.40.0357. One of the options provides a standard range for the crime with which

the juvenile was convicted. RCW 13.40.0357 (Option A). But the last option

allows the judge to sentence a juvenile to a manifest injustice disposition, which

can be either above or below the standard range. RCW 13.40.0357 (Option D). In

order to sentence a juvenile to a manifest injustice disposition, the judge must first

find by clear and convincing evidence that the standard range disposition would

cause a manifest injustice. RCW 13.40.160(2). Under the statute, "manifest

injustice" is defined, in relevant part, as a disposition that "would impose a serious,

and clear danger to society in light of the purposes of this chapter." RCW

13.40.020(19). At a dispositional hearing, "all relevant and material evidence,

including oral and written reports, may be received by the court and may be relied

7

upon to the extent of its probative value." RCW 13.40.150(1). The judge must also

consider certain aggravating and mitigating factors in deciding whether a

juvenile's disposition would effectuate a manifest injustice. RCW 13.40.150(3).[6]

The statute further prohibits the judge from considering certain factors in imposing

a disposition. RCW 13.40.150(4)-(5).

II.     Notice of Aggravating Factors Supporting a Manifest Injustice Disposition

M.S. argues that juveniles, prior to a plea, are entitled to notice of the intent

to impose a manifest injustice disposition and the specific factors supporting any

postplea manifest injustice disposition. By statute, the Juvenile Justice Act of 1977

(JJA), ch. 13.40 RCW, explicitly requires that juveniles be provided with due

process and with adequate notice. One of the "equally important purposes" of the

JJA is to "[p]rovide due process for juveniles alleged to have committed an

offense." RCW 13.40.010(2)(e). The JJA further states that juveniles are entitled to

---

[6] More specifically, the court is required to consider the following aggravating factors:

"(i) In the commission of the offense, or in flight therefrom, the respondent inflicted or attempted to inflict serious bodily injury to another;

"(ii) The offense was committed in an especially heinous, cruel, or depraved manner;

"(iii) The victim or victims were particularly vulnerable;

"(iv) The respondent has a recent criminal history or has failed to comply with conditions of a recent dispositional order or diversion agreement;

"(v) The current offense included a finding of sexual motivation pursuant to RCW 13.40.135;

"(vi) The respondent was the leader of a criminal enterprise involving several persons;

"(vii) There are other complaints which have resulted in diversion or a finding or plea of guilty but which are not included as criminal history; and

"(viii) The standard range disposition is clearly too lenient considering the seriousness of the juvenile's prior adjudications." RCW 13.40.150(3)(i).

8

notice in "adjudicatory proceedings before the court." RCW 13.40.140(7). The substance of the due process protections mandated by the JJA are consistent with the requirements of the due process clause of the Fourteenth Amendment to the United States Constitution. Thus, this case requires us to consider the extent to which due process's notice requirements apply to juvenile guilty pleas resulting in manifest injustice dispositions.

In *Gault*, the United States Supreme Court analyzed due process's notice requirement in the context of a juvenile delinquency proceeding. *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967). The Court first highlighted that due process of law is the "primary and indispensable foundation of individual freedom" that "delimits the powers which the state may exercise." *Gault*, 387 U.S. at 20. The Court reasoned that the individual freedom assured by due process is effectuated through "procedural rules which have been fashioned from the generality of due process." *Gault*, 387 U.S. at 21. The Court concluded that these procedural rules must ensure that juvenile proceedings "'measure up to the essentials of due process and fair treatment.'" *Gault*, 387 U.S. at 30 (quoting *Kent v. United States*, 383 U.S. 541, 562, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966)). In applying these due process principles to determine the notice to which juveniles are entitled, the Court held that juveniles have a right to notice of the criminal charges against them, which "must be given sufficiently in advance of scheduled

*State v. M.S.*, No. 96894-2

court proceedings so that reasonable opportunity to prepare will be afforded, and it must 'set forth the alleged misconduct with particularity.'" *Gault*, 387 U.S. at 33 (quoting PRESIDENT'S COMM'N ON LAW ENF'T & ADMIN. OF JUSTICE, THE CHALLENGE OF CRIME IN A FREE SOCIETY 87 (1967)). The Court found that the juvenile was deprived of constitutionally adequate notice because they were not notified of the underlying basis of the charges prior to a delinquency hearing on the merits.

The United States Supreme Court has generally extended due process protections only to adjudicatory stages of juvenile proceedings. *In re Winship*, 397 U.S. 358, 366, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). In *Winship*, the Court concluded that the requirement that elements of a crime be proved beyond a reasonable doubt extends to juveniles charged with crimes because, similar to the notice required in *Gault*, it is an essential aspect of due process that occurs at an adjudicatory stage of juvenile proceedings. While we have recently held that there is no constitutionally protected liberty interest in the dispositional guidelines because they provide only discretion in imposing sentences, we did not rule on the adjudicatory nature of the notice of facts and aggravating factors forming the basis of those sentences. *State v. T.J.S.-M.,* 193 Wn.2d 450, 462 n.3, 441 P.3d 1181 (2019).

*State v. M.S.*, No. 96894-2

We have recognized the importance to due process of notice of aggravating factors in *Siers,* where we considered the requisite notice of aggravating factors for adult criminal defendants sentenced to exceptional sentences pursuant to the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW. We held that a charging document need not contain the aggravating factors leading to an exceptional sentence. But we highlighted that "'notice of aggravating circumstances [was] required as a matter of due process. Due process is satisfied when the defendant receives sufficient notice from the State to prepare a defense against the aggravating circumstances that the State will seek to prove in order to support an exceptional sentence.'" *Siers*, 174 Wn.2d at 278 (quoting *State v. Powell*, 167 Wn.2d 672, 682, 223 P.3d 493 (2009) (plurality opinion); *Siers* overruled *Powell* in part). *Siers* established notice of aggravating factors as a part of the protections afforded by due process in adult criminal proceedings. The question here is whether, and to what extent, these requirements apply to the juvenile context.

Aggravating factors supporting manifest injustice dispositions present similar notice concerns as exceptional sentences under the SRA. A manifest injustice disposition, like an exceptional sentence under the SRA, requires a *finding* before permitting a sentence above the standard range. RCW 13.40.160(2) ("If the court concludes, and enters reasons for its conclusion, that disposition within the standard range would effectuate a manifest injustice the court shall

11

impose a disposition outside the standard range."); RCW 9.94A.535 ("The court

may impose a sentence outside the standard sentence range for an offense if it

finds, considering the purpose of this chapter, that there are substantial and

compelling reasons justifying an exceptional sentence."). Without finding that a

standard range disposition would effectuate a manifest injustice, the court may not

sentence a juvenile who has pleaded guilty to a term of confinement that exceeds

the standard range. *See* RCW 13.40.160(1)(a); *see also* RCW 13.40.162(3),

.165(6)(b). Both the JJA and the SRA also explicitly list aggravating factors used

to extend sentences beyond the standard range. *See* RCW 13.40.150(3)(i)(i)-(viii);

RCW 9.94A.535(3). *Siers* required notice of aggravating factors to allow

defendants to adequately prepare to meet the State's allegations that an exceptional

sentence is warranted. Because notice of aggravating factors in the JJA and the

facts supporting those aggravating factors serves the same purpose, the notice at

issue in these juvenile cases involves an adjudicatory issue where due process's

notice requirements announced in *Siers* apply.

　　　As established in *Gault* and its progeny, the standard governing due process

notice requirements is one of "fundamental fairness." *McKeiver v. Pennsylvania*,

403 U.S. 528, 543, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971).[7] In *McKeiver*, the Court

---

[7] We do not analyze the applicability of *Apprendi* and *Blakely* to juvenile proceedings because we resolve this case on separate grounds.

12

applied this standard and held that due process does not require a jury in juvenile

adjudicatory proceedings. In its analysis, the Court outlined the history of *Gault* and

related cases extending certain due process protections to juvenile proceedings, and it

reaffirmed the principle that whether procedural requirements are imposed in juvenile

proceedings based on due process ultimately depends on whether those procedures

are necessary for the proceedings to be fundamentally fair.[8] In this inquiry, we keep

in mind that we impose procedural rules based on due process to ultimately ensure

that a fair balance is struck between those charged with crimes and the power of

the State. We also consider that a fundamental articulated reason supporting notice

requirements is to provide the information critical to the decision of whether to

proceed to trial or plead guilty.

The State appears to acknowledge that some preplea notice is required in

this case. Resp't's Answer to Amici Curiae at 5-6, 11. The State, though, argues

that the notice given in this case satisfies due process because the JJA requires a

full hearing before entering a disposition after revocation of a deferred disposition.

Suppl. Br. of Resp't (June 1, 2020) at 15-20. The concurrence/dissent also

emphasizes the JJA's focus on rehabilitation. Concurrence/dissent at 18-23. The

State argues that juveniles will be overwhelmed with the legal aspects of providing

---

[8] We have applied a similar standard in our cases. *See State v. Quiroz*, 107 Wn.2d 791, 798, 733 P.2d 963 (1987) (analyzing whether the notice of juvenile criminal charges resulting in diversion agreements "meets our conceptions of fair play").

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

notice of aggravating factors preplea. Suppl. Br. of Resp't (June 1, 2020) at 17-19. Contrary to these assertions, the JJA and our cases require notice before a guilty plea.

Such notice is necessary for several purposes, including to provide juveniles with the information to formulate their strategy and ultimately assess the risk of pleading guilty. Even if resolution of a deferred disposition will enable preparation and decision-making, later notice of these factors at a revocation hearing is an inadequate substitute because that hearing differs substantially from a trial. And the requirement of notice preplea applies with special force to juveniles because children are less likely to be able to understand and weigh their options than adults. Br. of Amici Curiae Am. Civil Liberties Union et al. at 11-15. Notice is necessary preplea because that is the critical point at which the juvenile will consider whether go to trial or to plead guilty; notice after the plea undermines juveniles' ability to make an informed decision because the factual basis of the ultimate disposition at the time of the plea remains unknown. The uncertainty of a juvenile's sentence caused by the lack of notice conflicts with the JJA's requirement that a juvenile "[a]cknowledge the direct consequences of being found guilty and the direct consequences that will happen if an order of disposition is entered." RCW 13.40.127(3)(d).

*State v. M.S.*, No. 96894-2

Relatedly and equally important is that without notice of the facts that may determine the length of a juvenile's sentence at the time of the plea—the most significant consequence of pleading guilty that drives a juvenile's strategy and decision to plead guilty—a sentence pursuant to such a plea runs contrary to the juvenile's right to counsel. RCW 13.40.140(1)-(2). Requiring no notice in this context renders a juvenile's right to counsel meaningless because an attorney is unable to adequately advise their client of the sentence the client may receive. The information available to the attorney at the time of the plea provides the basis for the attorney's advice about the pros and cons of the different options available at the time of plea. Giving notice of these facts preplea is necessary to guide the attorney's investigation and research. For example, assume that as in this case, a manifest injustice disposition is based on facts occurring postplea. At the time of plea, an attorney is unable to adequately discharge their duty because they do not have the ability to subpoena or gather information on witnesses that do not yet exist. An attorney's duty to advise their client supports the requirement that this notice be given preplea and be based only on facts occurring preplea.

And giving notice of the factual basis of manifest injustice dispositions preplea is consistent with the statutory scheme for dispositional hearings. The JJA confirms that the only facts that should form the basis of a juvenile's manifest injustice disposition are those occurring before the plea is entered. Conduct

15

occurring postplea, as exists in this case, does not equate to a crime-related aggravating factor. The aggravating factors listed in the statutory scheme governing dispositional hearings are all backward looking and relate to the crime itself. RCW 13.40.150(3)(i)(i)-(viii). The statutory scheme governing juvenile dispositional hearings further shows that the facts relevant to a juvenile's disposition are those related to the crime as charged and, thus, are the facts available at the time a juvenile pleads guilty. *See, e.g.*, RCW 13.40.150(3)(a) (stating that at a dispositional hearing, a court will "[c]onsider the facts supporting the allegations of criminal conduct by the respondent").

Moreover, prosecutors, in other contexts, are forced to choose sentencing enhancements or aggravators associated with the underlying crime prior to trial or to plea. *See State v. Recuenco*, 163 Wn.2d 428, 432-34, 437, 180 P.3d 1276 (2008). While the State will have to assert facts and aggravators initially to preserve the ability to seek a manifest injustice disposition, moving up the timeline of when the State must give this notice does not impose such a heavy burden as to outweigh the fundamental fairness of providing notice prior to the entry of a plea. Other options are available for the State to deal with misconduct occurring postplea. As occurred in this case, violations occurring after the plea can result in sanctions short of full sentencing. Additional charges may also be filed after the plea is entered.

16

*State v. M.S.*, No. 96894-2

In a practical sense, a manifest injustice disposition results in additional confinement the same as an additional criminal charge would. The concurrence/dissent argues the better procedure for imposing additional confinement occurs at the dispositional hearing based on a consideration of the specific needs of the juvenile. The concurrence/dissent highlights that additional criminal charges can carry other negative collateral consequences and that M.S. likely would have been sentenced to a longer term of confinement if new criminal charges were sought. Concurrence/dissent at 22-23. While that concern may be valid, the rule suggested by the concurrence/dissent does nothing to prevent a prosecutor from making that decision. And requiring preplea notice guides a court's sentencing discretion and links punishment to the criminal conduct.

Adopting the concurrence/dissent's rule removes information critical to the decision whether to accept a plea offer, plead guilty, or go to trial and injects uncertainty into potential consequences. At the time of the plea, when consequences are most important to the decision, a juvenile would have no certainty of the potential sentence. Standard range as opposed to manifest injustice sentences lose any distinction to the juvenile's decision to plea if, as the concurrence/dissent would reason, the court retains wide discretion later at a dispositional hearing. But this view undercuts the principle basis of notice altogether if a juvenile cannot choose their best option.

17

*State v. M.S.*, No. 96894-2

Requiring notice of the basis of a manifest injustice disposition is not inconsistent with the JJA's purpose of rehabilitation, as the concurrence/dissent suggests. Concurrence/dissent at 19-21. A court still has discretion to consider and respond to an individual juvenile's needs at a dispositional hearing. But that consideration should not result in a manifest injustice disposition and more confinement where the juvenile does not have notice before the plea of the basis of that disposition.

Finally, a juvenile should not face an exceptional sentence for electing a negotiated deferral where, had they chosen to go to trial and lost, they would get a standard range sentence absent allegations and proof of a basis for a manifest injustice disposition. In this case, had M.S. gone to trial and lost, his standard range would have provided up to a maximum of 30 days in the JRA. Instead, he was sentenced to 52 weeks, which is 12 times the maximum standard range sentence, based on facts that occurred after the plea. The difference in these sentences for the same crime reinforces why fundamental fairness requires that juveniles have all information available to them about what will be used to calculate their sentence so that with the help of their attorney, they can make an informed decision about whether to plead guilty.

We require notice of the facts and aggravating factors used to support a manifest injustice disposition prior to a juvenile pleading guilty. Juveniles must be

*State v. M.S.*, No. 96894-2

given notice of all facts used to impose a manifest injustice disposition so that they

have all available information to prepare to meet the allegations and properly

assess their decision to proceed to trial or plead guilty. If the State fails to provide

notice of aggravating factors prior to entry of the plea, manifest injustice findings

are invalidated. While a juvenile must have notice of the factual basis of the plea

and, thus, conduct occurring postplea may not be used to impose a manifest

injustice disposition, any facts occurring after the plea and deferral may still cause

a revocation of a deferred disposition.

### III.     Nonstatutory Aggravating Factors

M.S. also argues that the trial court erred by supporting his manifest

injustice disposition with nonstatutory aggravating factors.[9] We first look to the

statute's plain language to determine the legislative intent, and the plain language

is controlling when it is unambiguous. The plain language is ambiguous if it is

amenable to more than one reasonable interpretation. And if the language is

ambiguous, we may look to legislative history to ascertain the legislative intent.

*State v. B.O.J.*, 194 Wn.2d 314, 323, 449 P.3d 1006 (2019).

M.S. argues that juvenile courts lack inherent authority to impose sentences,

and they are therefore limited to the aggravating factors listed in the statute

---

[9] The nonstatutory aggravating factors included the following: (1) high risk to reoffend, (2) inability of M.S.'s supervisors to control him, and (3) M.S.'s treatment needs that could not be addressed in the community.

*State v. M.S.*, No. 96894-2

governing juvenile dispositions. But we have already stated that courts may consider nonstatutory aggravating factors in imposing a manifest injustice disposition. *State v. Rhodes,* 92 Wn.2d 755, 759, 600 P.2d 1264 (1979) ("[T]he court is not limited to consideration of these [statutorily enumerated] factors."), *overruled on other grounds by State v. Baldwin,* 150 Wn.2d 448, 78 P.3d 1005 (2003).

In support of his theory that nonstatutory factors are prohibited, M.S. cites *State v. Bacon,* 190 Wn.2d 458, 415 P.3d 207 (2018), which held that juvenile courts lack inherent authority to suspend manifest injustice dispositions. In *Bacon*, the language of the statutory scheme specifically mentioned the instances in which a disposition could be suspended, stating that "'the court shall not suspend or defer the imposition or the execution of the disposition'" unless one of those exceptions were present. 190 Wn.2d at 466 (quoting RCW 13.40.160(10)). Because the section under which Bacon was sentenced was not within any of the enumerated sections where a suspended disposition was permitted, we concluded that the legislature's omission was intentional under the rule of statutory interpretation expressio unius est exclusio alterius: the express inclusion of items in a series excludes others that are not mentioned. *Bacon,* 190 Wn.2d at 466-67.

The language of the statute for aggravating factors and manifest injustice dispositions in this case is distinguishable from the language for the suspension of

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

dispositions in *Bacon*. The language of the suspension statute states that a disposition may not be suspended *unless* an enumerated exception is present. Unlike the list of enumerated exceptions for suspended dispositions, the JJA does not expressly state that a manifest injustice disposition upward may be imposed based only on the enumerated aggravating factors. The court may consider all material and probative evidence in entering a disposition. RCW 13.40.150(1). The limit on what a court may consider as an aggravating factor is that the factor must relate to the juvenile posing a "serious, and clear danger to society." RCW 13.40.020(19). Given that manifest injustice dispositions are limited only by the definition of manifest injustice, the rule of expressio unius est exclusio alterius does not apply to the aggravating factors in this case.

Two other reasons compel our conclusion that the aggravating factors are not an exclusive list. First, the statute explicitly prohibits courts from considering certain factors in imposing its disposition. RCW 13.40.150 (4)-(5). If we interpret the aggravating factors as exclusive, then the language excluding certain other factors would be rendered superfluous. *State v. K.L.B.,* 180 Wn.2d 735, 742, 328 P.3d 886 (2014). Second, if we were to conclude that the plain language is ambiguous, the legislative history supports that the aggravating factors are not exclusive. A previous version of RCW 13.40.160, which generally governs the lengths of juvenile dispositions, stated that "where the appropriate standard range

21

does not include a period of confinement exceeding thirty days, [the court shall] sentence the offender to a determinate term within the appropriate standard range in which case the court *shall consider only those aggravating and mitigating factors set forth in RCW 13.40.150*." Former RCW 13.40.160(4)(a)(ii) (1977) (emphasis added). No similar language limits manifest injustice dispositions to the aggravating factors set forth in RCW 13.40.150.

Finally, we clarify that while nonstatutory aggravating factors may be considered in imposing manifest injustice dispositions, we still require that these factors operate in harmony with our notice requirements. Juveniles must have preplea notice of the facts and aggravating factors supporting manifest injustice dispositions. These factual findings made at the plea phase must support the manifest injustice disposition.

## CONCLUSION

We hold that juveniles are entitled to preplea notice of the facts and aggravating factors supporting manifest injustice dispositions, and we reverse the Court of Appeals. We also hold that courts may consider nonstatutory aggravating factors to support manifest injustice dispositions.

22

*State v. M.S.*, No. 96894-2

Johnson, J.

WE CONCUR:

González, C.J.

Gordon McCloud, J.

Owens, J.

Montoya-Lewis, J.

*State v. M.S.*, No. 96894-2

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

No. 96894-2

STEPHENS, J. (concurring in part, dissenting in part)—This case is about the fundamental differences between the juvenile justice system and the adult criminal justice system—and whether those differences ought to remain. Though its goal is to protect juvenile offenders, today's majority unavoidably puts juveniles like M.S. at greater risk of criminal prosecution because of the absurd result it commands. By requiring preplea notice of events that have not yet happened, the majority undermines the discretion of juvenile courts to impose an appropriate disposition and treats manifest injustice dispositions as if they were aggravated adult sentences.

Instead, I would hold that juvenile offenders must be advised, before pleading guilty, of the possibility that what they do between entering their plea and appearing at their disposition hearing may be considered by the juvenile court in support of a manifest injustice disposition. That notice addresses the majority's concern that

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

juvenile offenders be able to make informed strategic decisions about whether to plead guilty. But, unlike the majority's rule, it does not unduly limit the discretion of juvenile courts by requiring them to give impossible notice of specific facts that do not yet exist. Because M.S. was repeatedly warned that his actions after entering his guilty plea could be considered by the juvenile court in support of a manifest injustice hearing, I would hold that he received constitutionally adequate notice. I therefore respectfully dissent from the portion of the majority opinion that would invalidate M.S.'s manifest injustice disposition.[1]

### RELEVANT FACTS

M.S. was charged in juvenile court with assault, based on throwing a bottle of urine on a King County bus driver. He pleaded guilty and requested a deferred disposition, so the juvenile court engaged M.S. in a lengthy colloquy to ensure he understood the benefits and consequences of a deferred disposition. The juvenile court confirmed M.S. had reviewed the terms of his deferred disposition with his attorney and listened to M.S. describe deferred dispositions in his own words. The

---

[1] I concur with the majority's analysis and conclusions as to the use of nonstatutory aggravating factors, except to the extent the majority suggests all aggravating factors must relate to the underlying crime.

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

juvenile court then elaborated on the possible outcomes of M.S.'s deferred

disposition:

> THE COURT: If, as you and I talked about, if you do everything you're supposed to do, then the case gets dismissed. It goes right off your record. If you don't do everything you're supposed to do, I can revoke your deferred disposition. If I revoke your deferred disposition, then the crime goes on your record and you get sentenced, do you understand that?
>
> THE RESPONDENT: Yes, I do.
>
> THE COURT: If I sentence you, your standard range in this case, based on the type of offense it is is zero to 12 months of probation or community supervision, zero to . . . 150 hours of community service, a zero to $500 fine, zero to 30 days in detention, and that you pay restitution. Do you understand that standard range sentence?
>
> THE RESPONDENT: Yes.
>
> THE COURT: I'd be required to sentence you within that standard range unless I found special circumstances or what we call aggravating factors that made that standard range sentence what we call a manifest injustice, do you understand that?
>
> THE RESPONDENT: Yes.
>
> THE COURT: If I did find a manifest injustice and gave you a higher sentence, you'd have the right to appeal that to a higher court as well, do you understand that?
>
> THE RESPONDENT: Yes.

Verbatim Report of Proceedings (VRP) (Jan. 3, 2018) at 13-14. The juvenile court

granted M.S.'s request for a deferred disposition—with some conditions—in

January 2018.

M.S. violated the conditions of his deferred disposition on multiple occasions.

The juvenile court initially decided to give M.S. a second chance, imposing

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

sanctions rather than revoking the deferred disposition. At a hearing discussing

M.S.'s violations, the juvenile court again engaged M.S. in a colloquy to make clear

that he was at risk of losing his deferred disposition altogether if he continued to

violate the conditions:

> THE COURT: So my question for you is, when you [are] released,
> are you going to follow Mr. Cerdinio's [instructions]?
>
> RESPONDENT: Yes.
>
> THE COURT: If those rules include following the rules at Cypress
> House, are you going to follow those rules?
>
> RESPONDENT: Yes.
>
> THE COURT: So the deal is, if you follow the rules, then you're
> going to stay out of custody. If you don't, then my only option in order to
> keep you safe is going to be something a lot different. Do you understand
> that?
>
> RESPONDENT: Yes.
>
> THE COURT: All right. I understand the concern. At this point I
> have—my options are pretty limited, and I'm going to impose the ten days
> [sanction], so he'll be in custody for a period of time. He'll have a chance
> to rest and get some sleep and get himself reset. He'll have a chance to talk
> to Mr. Cerdinio, he'll have a chance to talk to his social worker and make
> sure that he understands what the expectations are once he's out, and then
> [M.S.] gets one more chance. And if [M.S.] doesn't follow through after
> this and I find him alive again, which I hope that I do, then he will likely be
> facing a revocation.

VRP (Mar. 22, 2018) at 60-61.

Unfortunately, even after this second chance, M.S. continued to "violate[] the

terms of his deferred disposition by failing to participate with the case management

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

process, failing to comply with case management, and not following through with his service providers." Clerk's Papers (CP) at 39. As a result, the juvenile court revoked M.S.'s deferred disposition and considered a manifest injustice disposition pursuant to RCW 13.40.0357. Among other things, the juvenile court found a manifest injustice disposition was appropriate because M.S. posed a high risk to reoffend. The juvenile court based that finding on testimony that in March and April 2018, after being sanctioned for his earlier violations, M.S. (1) "used a can of Axe [body spray] and a lighter as a blowtorch, threatening staff at Cypress House," (2) "tied a resident's and staffperson's hands together with a ziptie," (3) "assaulted a resident," (4) "tried to push a staff person down the stairs," (5) "threatened to beat up a resident," and (6) "has often been seen obviously intoxicated or high, to the point of making himself physically ill." CP at 40.[2] The juvenile court imposed a manifest injustice disposition of 52 weeks' detention.

---

[2] Though these events supporting the manifest injustice disposition occurred in March and April 2018, the majority insists the juvenile court should have somehow provided notice to M.S. such that they would be considered at the time of his guilty plea in January 2018. *See* majority at 18 ("We require notice of the facts and aggravating factors used to support a manifest injustice disposition prior to a juvenile pleading guilty.").

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

ANALYSIS

The question at the heart of this case is whether juvenile courts ought to retain the flexibility and discretion afforded under the Juvenile Justice Act of 1977 (JJA), ch. 13.40 RCW, to impose manifest injustice dispositions and hold juvenile offenders like M.S. responsible for criminal acts they commit *after* pleading guilty. Today's majority strips juvenile courts of that discretion, effectively requiring the State to file additional charges against juvenile offenders in order to hold them responsible for postplea criminal behavior, as the State does with adult offenders in similar situations. This is neither necessary nor wise. No one is well served by a juvenile justice system that behaves more like the rigid and punitive adult criminal justice system, least of all juvenile offenders. I would reaffirm the juvenile court's broad discretion in imposing juvenile offender dispositions and hold that M.S. received constitutionally sufficient notice of the potential consequences of violating the terms of his deferred disposition.

I.      Washington Law Recognizes Our Justice System Cannot Treat Juveniles Like Adults in Criminal Proceedings

This court has emphatically and repeatedly announced that "'[c]hildren are different'" from adults, and so "our criminal justice system [must] address this difference when punishing children." *In re Pers. Restraint of Ali*, 196 Wn.2d 220,

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

225, 474 P.3d 507 (2020) (quoting *State v. Houston-Sconiers*, 188 Wn.2d 1, 8, 391 P.3d 409 (2017)), *cert. denied*, No. 20-830 (U.S. Mar. 29, 2021). To that end, we have required that Washington courts "take into account the differences between children and adults in criminal sentencing." *Id.* (citing *State v. Ramos*, 187 Wn.2d 420, 428, 387 P.3d 650 (2017)). We have recognized that courts sentencing children as adults must have significant discretion "to impose any sentence below the otherwise applicable [sentencing] range and/or sentence enhancements." *Houston-Sconiers*, 188 Wn.2d at 21. And we have held that when courts resentence juvenile offenders to comply with these requirements, they "must consider the measure of rehabilitation that has occurred since a youth was originally sentenced." *State v. Delbosque*, 195 Wn.2d 106, 121, 456 P.3d 806 (2020). In sum, we have decided the rigid requirements of the adult criminal justice system must bend in consideration of the mitigating and dynamic qualities of youth.

Our legislature, too, has long recognized that the differences between children and adults require that our justice system treat children and adults differently. Accordingly, the legislature has established distinct criminal procedures and sentencing schemes for children and adults: the JJA and the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW. The SRA is a determinate sentencing scheme

7

designed to produce consistent and predictable punishments for adult offenders based on the type of offense, the offenders' criminal history, and any aggravating factors that heighten the offenders' liability. RCW 9.94A.010. In contrast, the JJA is designed to facilitate a highly individualized process that empowers juvenile courts to defer, suspend, or modify juvenile sentences as necessary to serve the interests of justice. RCW 13.40.0357. "While punishment is the paramount purpose of the adult criminal system, the policies of the JJA are twofold: to establish a system of having primary responsibility for, being accountable for, and responding to the needs of youthful offenders, and to hold juveniles accountable for their offenses." *State v. Chavez*, 163 Wn.2d 262, 267-68, 180 P.3d 1250 (2008) (citing *State v. Posey*, 161 Wn.2d 638, 645, 167 P.3d 560 (2007)). The flexibility inherent in the JJA has served Washington well for many years, allowing juvenile courts to administer justice in a way that serves both the community and justice-system-involved youth.

II.   The Juvenile Justice System and Adult Criminal Justice System Are Constitutionally Distinct

The JJA's dual approach is possible because "the juvenile court proceeding has not yet been held to be a 'criminal prosecution,' within the meaning and reach of the Sixth Amendment [to the United States Constitution]." *McKeiver v.*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Pennsylvania*, 403 U.S. 528, 541, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971) (citing

*Kent v. United States*, 383 U.S. 541, 554, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966); *In

re Gault*, 387 U.S. 1, 17, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967); *In re Winship*, 397

U.S. 358, 365-66, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)); *see also* RCW 13.04.240

("An order of court adjudging a child a juvenile offender . . . shall in no case be

deemed a conviction of crime."). "From the inception of the juvenile court system,

wide differences have been tolerated—indeed insisted upon—between the

procedural rights accorded to adults and those of juveniles." *Gault*, 387 U.S. at 14.

"'[O]ur acceptance of juvenile courts distinct from the adult criminal justice systems

assumes that juvenile offenders constitutionally may be treated differently from

adults.'" *State v. Schaaf*, 109 Wn.2d 1, 20, 743 P.2d 240 (1987) (quoting *Bellotti v.

Baird*, 443 U.S. 622, 635, 99 S. Ct. 3035, 61 L. Ed. 2d 797 (1979) (plurality

opinion)). "'If the formalities of the criminal adjudicative process are to be

superimposed upon the juvenile court system, there is little need for its separate

existence.'" *State v. S.J.C.*, 183 Wn.2d 408, 418, 352 P.3d 749 (2015) (quoting

*McKeiver*, 403 U.S. at 551).

Of course, "neither the Fourteenth Amendment nor the Bill of Rights is for

adults alone." *Gault*, 387 U.S. at 13. "[A]lthough the Fourteenth Amendment does

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

not require that the [juvenile court] hearing . . . conform with all the requirements of a criminal trial or even of the usual administrative proceeding, the Due Process Clause does require application during the adjudicatory hearing of 'the essentials of due process and fair treatment.'" *Winship*, 397 U.S. at 359 (internal quotation marks omitted) (quoting *Gault*, 387 U.S. at 30). Said another way, "the applicable due process standard in juvenile proceedings . . . is fundamental fairness." *McKeiver*, 403 U.S. at 543.

Courts must therefore determine which of the specific "procedural rules [that] have been fashioned from the generality of due process" in the adult criminal context are necessary to protect the fundamental fairness of juvenile justice proceedings. *Gault*, 387 U.S. at 21. To do so, we must "ascertain the precise impact of the due process requirement upon such proceedings" and inquire whether it is necessary to guarantee fundamental fairness. *Id.* at 13-14.

The procedural rule at issue here is the requirement anchored in *Apprendi v. New Jersey*[3] that adult offenders be given "'sufficient notice from the State to prepare a defense against the aggravating circumstances that the State will seek to prove in order to support an exceptional sentence.'" *State v. Siers*, 174 Wn.2d 269,

---

[3] 530 U.S. 466, 494, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

278, 274 P.3d 358 (2012) (quoting *State v. Powell*, 167 Wn.2d 672, 682, 223 P.3d 493 (2009) (plurality opinion); *Siers* overruled *Powell* in part). The majority concludes this rule applies in juvenile proceedings as a matter of fundamental fairness, so that juvenile offenders must receive notice "of the facts and aggravating factors used to support a manifest injustice disposition prior to . . . pleading guilty." Majority at 18. However, the majority bases its conclusion on the erroneous assumption that juvenile manifest injustice dispositions are constitutionally equivalent to adult exceptional sentences based on aggravating factors. Majority at 10-12. That flawed foundation undermines the remainder of the majority's analysis, which never fully grapples with the effect its new notice requirement will have on juvenile justice proceedings. The result is an absurd rule requiring a formal notice that cannot practically be given and that will unnecessarily expose juvenile offenders like M.S. to new criminal charges. Because I cannot agree to a result that undermines the flexibility of the juvenile justice system only to risk further criminalizing the postplea behavior of juvenile offenders, I respectfully dissent from that portion of the majority opinion.

    A. Juvenile Manifest Injustice Dispositions Are Not Constitutionally Equivalent to Adult Exceptional Sentences

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The majority relies heavily on our decision in *Siers* to support its comparison between manifest injustice dispositions and exceptional sentences. "However, a juvenile tried in juvenile court is *not* being tried in an adult criminal court and the analogy to adult criminal courts is not appropriate." *S.J.C.*, 183 Wn.2d 418 (rejecting application of the constitutional right to open courts to juvenile justice proceedings). The majority's argument by analogy fails to "ascertain the precise impact" its new rule will have on juvenile justice proceedings. *Gault*, 387 U.S. at 21. The majority further errs by declining to analyze the United States Supreme Court cases that provide the foundation for the *Siers* decision. *See* majority at 12 n.7 ("We do not analyze the applicability of *Apprendi* and *Blakely* to juvenile proceedings because we resolve this case on separate grounds."). Had the majority engaged with those cases, it would have discovered that the constitutional concerns requiring notice of aggravating factors to support exceptional sentences do not apply with equal force in the juvenile context.

*Apprendi* teaches that in determining whether full due process rights attach to aggravating factors, "the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the [offender's] guilty [plea]?" 530 U.S. at 494. When the finding "is used to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

describe an increase beyond the *maximum* authorized statutory sentence [or a heightened *minimum* authorized statutory sentence], it is . . . an element of a greater offense than the one covered by the [juvenile's] guilty [plea]" and full due process protections apply. *Id.* at 494 n.19 (emphasis added); *see also Alleyne v. United States*, 570 U.S. 99, 103, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013). But other factors, "which may be either aggravating or mitigating in character, that support[] a specific sentence *within the range* authorized by the [defendant's plea of] guilty [to] a particular offense," are mere "sentencing factors" not subject to full due process protections. *Apprendi*, 530 U.S. at 494 n.19

Simply put, due process requires notice of aggravating factors that increase the applicable range of punishment, but not of aggravating factors that support a higher sentence within the applicable range of punishment. *See State v. Allen*, 192 Wn.2d 526, 431 P.3d 117 (2018) ("'The essential point is that the aggravating fact produced a higher range, which, in turn, conclusively indicates that the fact *is an element* of a distinct and aggravated crime.'" (quoting *Alleyne*, 570 U.S. at 115-16)). Therefore, even assuming this due process framework applies equally in the juvenile context, the JJA aggravating factors are subject to full due process protections only if they increase the applicable range of punishment for a juvenile defendant.

13

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

We recently held that aggravating circumstances in the adult criminal justice scheme are subject to due process protections because "by law, they increase the minimum penalty for first degree murder." *Allen*, 192 Wn.2d at 539. "If the jury found that [any] one of the aggravating circumstances existed, the minimum penalty for each first degree murder conviction would increase from a term of years to mandatory life imprisonment without the possibility of release or parole." *Id.* at 530. And the law provides that when such circumstances are found, the defendant is guilty of aggravated first degree murder under RCW 10.95.020 instead of regular first degree murder under RCW 9A.32.030(1)(a). *Id.* Accordingly, the aggravating circumstances in the adult context constitute elements of the crime of aggravated first degree murder rather than sentencing factors of regular first degree murder; they are therefore subject to full due process protections. *Id.* at 539.

Similarly, the SRA permits courts to "impose a sentence outside the standard range for an offense if it finds . . . that there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535. To guide courts in deciding whether substantial and compelling reasons exist to impose an exceptional sentence, the SRA establishes "an exclusive list of factors that can support a sentence above the standard range." RCW 9.94A.535(3). In other words, the finding of specified

14

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

aggravating factors exposes adult offenders to a higher category of punishment than they would otherwise be eligible to receive. Due process protections attach to "any fact that increases the penalty for a crime beyond the prescribed statutory maximum," so due process protections attach to the SRA's aggravating factors. *Apprendi*, 530 U.S. at 490.

But the JJA's aggravating factors operate very differently from the SRA's exceptional sentence factors or the aggravating circumstances at issue in *Allen*. While the aggravating circumstances in the adult context result in the conviction of a different crime and/or the application of a higher range of punishment, the JJA's aggravating factors do not change the crime or the applicable range of punishment. In fact, manifest injustice dispositions are on the table in every juvenile justice disposition hearing, so the finding of an aggravating factor supporting a manifest injustice disposition does not increase the applicable range of punishment for any juvenile offender. *See* RCW 13.40.0357, .300(1). Moreover, the juvenile court can impose a manifest injustice disposition without reference to any aggravating factors at all; the JJA requires only that the juvenile court find that a standard range sentence "would impose a serious, and clear danger to society." RCW 13.40.020(19). Even

15

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

if the juvenile court finds aggravating factors exist, that finding does not compel the imposition of a manifest injustice sentence. *Id.*

Another important difference is that the JJA empowers juvenile courts to consider multiple alternatives to the standard range disposition at every disposition hearing. The JJA provides that "the court shall impose a determinate disposition within the standard ranges, *except as provided in subsection (2), (3), (4), (5), or (6) of this section*." RCW 13.40.160(1)(a) (emphasis added). Even if the juvenile court does not make a manifest injustice finding, it can still impose a disposition other than the standard range. *See* RCW 13.40.160(3) ("If a juvenile offender is found to have committed a sex offense, . . . the court may impose the special sex offender disposition alternative."), (4) ("If the juvenile offender is subject to a standard range disposition . . . , the court may impose the [substance use or mental health] disposition alternative under RCW 13.40.165."), .0357(B)(1) ("If the offender is subject to a standard range disposition involving confinement by the department, the court may impose the standard range and suspend the disposition on condition that the offender comply with one or more local sanctions and any educational or treatment requirement."). These disposition options, as well as manifest injustice dispositions, are always on the table. Unlike the SRA, which makes the standard

16

range sentence the default punishment in every case, the JJA permits juvenile courts to consider multiple alternatives to the standard range disposition in order to serve the JJA's dual goals of punishment and rehabilitation.

There are other differences between the JJA and the adult sentencing world. The JJA's aggravating factors *must* be considered in every disposition hearing, regardless of whether the juvenile court is considering a manifest injustice disposition. RCW 13.40.150(3)(i) ("Before entering a dispositional order as to a respondent found to have committed an offense, the court shall hold a disposition hearing, at which the court shall: . . . Consider whether or not any of the following aggravating factors exist . . . ."). Because the juvenile court shall consider aggravating factors in every disposition hearing, we cannot hold that consideration of those factors without preplea notice was unconstitutional here without holding that such consideration is unconstitutional in all cases. The JJA also permits juvenile courts in disposition hearings to consider "all relevant and material evidence, including oral and written reports," "arguments offered by parties and their counsel," "any predisposition reports," testimony of the juvenile's "parent, guardian, or custodian," "the [juvenile's] offender score," and more. RCW 13.40.150. None of those facts compel any particular result. Instead, these wide ranging and

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

nonexclusive considerations allow juvenile courts to evaluate youthful offenders holistically and determine what combination of treatment, services, and supervision might best help them going forward, while also balancing public safety concerns.

The constitutional differences between adult exceptional sentences and juvenile manifest injustice dispositions are clear. Recall that for the due process concerns identified by the majority, "the relevant inquiry is [whether] the required finding expose[s] the defendant to a greater punishment." *Apprendi*, 530 U.S. at 495. The SRA creates a specific list of factors that—if found—expose adult offenders to higher categories of punishment. In contrast, the JJA creates a nonexclusive list of factors that—if found—merely support a manifest injustice disposition that is already on the table. Because the JJA's aggravating factors do not expose juvenile defenders to greater punishments than they could receive in any disposition hearing, the due process concerns associated with the SRA's aggravating factors do not apply with equal force. Viewed through the lens of *Apprendi*, the foundation of the majority's reasoning crumbles.

B. The Flexibility of the JJA's Sentencing Scheme Wisely Permits Juvenile Courts To Consider Postplea Facts Supporting Manifest Injustice Dispositions Rather Than Exposing Juveniles to New Criminal Charges

18

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

Aside from relying on an analogy to adult sentencing that does not withstand scrutiny, the majority's holding carries undesirable consequences for juvenile offenders. The SRA and the JJA are not equivalents in their treatment of offenders who violate the terms of their release from custody by committing new crimes. Under the SRA's rigid system, the consequences are predictable: adult offenders who commit new crimes in violation of the terms of their release from custody are subject to punitive sanctions and new criminal charges.[4]  *See, e.g.*, RCW 9.94A.716(3) ("If an offender has been arrested by the department for a new felony offense while under community custody, . . . the department will hold the offender in total confinement . . . until a prosecuting attorney charges the offender with a crime, or until a prosecuting attorney provides written notice to the department that new charges will not be filed."), .706(1) ("No offender sentenced to a term of community custody under the supervision of the department may own, use, or possess firearms, ammunition, or explosives. An offender's actual or constructive possession of firearms, ammunition, or explosives shall be reported to local law enforcement or local prosecution for consideration of new charges and subject to

---

[4] The SRA provides that noncriminal violations of community custody conditions are subject only to sanctions, including "up to sixty days' confinement for each violation." RCW 9.94A.633.

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

sanctions."). "Punishment is the paramount purpose of the adult sentencing system," so the SRA seeks to punish criminal violations of community custody conditions like any other criminal act: with a discrete, predictable sentence. *State v. Rice*, 98 Wn.2d 384, 393, 655 P.2d 1145 (1982).

Contrast the SRA's rigidly punitive approach with the JJA, which provides that juvenile offenders who commit new crimes in violation of the terms of their deferred dispositions are subject to sanctions or revocation of their deferred disposition and entry of a disposition order. RCW 13.40.127(9)(a). Rather than exposing juvenile offenders to new criminal charges, the JJA permits juvenile courts to take postplea criminal behavior and other factors into account when entering a disposition order, including a manifest injustice disposition. *See* RCW 13.40.150(1) ("In disposition hearings *all relevant and material evidence . . .* may be received by the court and may be relied upon to the extent of its probative value, even though such evidence may not be admissible in a hearing on the information." (emphasis added)).[5] This flexible approach advances the JJA's "twin principles of

_____

[5] The majority erroneously suggests that "the only facts that should form the basis of a juvenile's manifest injustice disposition are those occurring before the plea is entered . . . [because the] aggravating factors listed in the statutory scheme governing dispositional hearings are all backward looking and relate to the crime itself." Majority at 15 (citing RCW 13.40.150(3)(i)(i)-(viii)). That claim stands in tension with the majority's holding

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

rehabilitation and punishment" by allowing juvenile offenders to be held responsible for violating the terms of their deferred dispositions without incurring the harsher sentences, longer criminal histories, and other negative consequences of new criminal charges. *Rice*, 98 Wn.2d at 394. The goal of the JJA is not to charge juvenile offenders with every possible criminal act but, instead, to hold juveniles accountable while supporting their rehabilitation. *See State v. B.O.J.*, 194 Wn.2d 314, 326-27, 449 P.3d 1006 (2019) ("The Act 'does not set up a rigidly punitive system,' and it is incumbent on the juvenile justice system to help its youthful offenders." (quoting *Rice*, 98 Wn.2d at 391)).

Unfortunately, the majority's decision today significantly erodes the flexibility and discretion of juvenile courts to hold juvenile offenders responsible for postplea criminal acts through the imposition of a manifest injustice disposition. It

---

that "the JJA does not expressly state that a manifest injustice disposition upward may only be imposed based only on the enumerated aggravating factors," so the only "limit on what a court may consider as an aggravating factor is that the factor must relate to the juvenile posing a 'serious, and clear danger to society.'" *Id.* at 20-21 (quoting RCW 13.40.020(19)). As happened here, a juvenile offender's postplea behavior may present significant evidence of how serious a danger that offender poses to the community if given a standard disposition. Nothing in the JJA expressly prevents juvenile courts from considering postplea behavior when determining whether to impose a manifest injustice sentence. Rather, "[t]he court may consider all material and probative evidence in entering a disposition." *Id.* at 21 (citing RCW 13.40.150(1)).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

ushers in the scenario we warned of nearly 40 years ago: disallowing juvenile courts

to take postplea facts into account in fashioning an appropriate disposition

> w[ill] leave the juvenile courts without a means of responding to the obvious needs of juveniles like the defendants. It w[ill] be, in effect, telling the juvenile court to ignore the needs of the juvenile until he is convicted of committing an even more serious offense. Such an approach is necessary under the adult system in which punishment is the paramount purpose and where the punishment must fit the crime. But it is inimical to the rehabilitative purpose of the juvenile justice system. It w[ill] destroy the flexibility the Legislature built into the system to allow the court, in appropriate cases, to fit the disposition to the offender, rather than to the offense.

*Rice*, 98 Wn.2d at 397.

Worse, by requiring that juvenile offenders receive notice of postplea criminal

acts before they ever enter the plea, the majority creates an absurd rule that no one

can follow.[6] The only way for a juvenile offender to obtain preplea notice of facts

that arise postplea is to plead twice. As the majority obliquely acknowledges,

today's decision leaves the State with only one option to hold juvenile offenders like

M.S. responsible for postplea criminal violations of their deferred disposition

---

[6] The majority claims that "moving up the timeline of when the State must give this notice does not impose such a heavy burden as to outweigh the fundamental fairness of providing notice prior to the entry of a plea." Majority at 16. That may be true for facts that exist preplea, but it is impossible for facts that do not exist at the time of the plea. Requiring the State to do the impossible imposes more than a heavy burden: it erects a complete bar to the use of postplea facts to support a manifest injustice disposition.

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

conditions: file new criminal charges against them. *See* majority at 16 ("Additional charges may also be filed after the plea is entered.").

The majority's holding imposes the rigidity of the adult criminal justice system on key features of the juvenile justice system, eliminating the essential discretion of juvenile courts and exposing juvenile offenders who commit crimes after pleading guilty to new and unnecessary criminal charges. *See id*. at 17 (arguing its holding appropriately "links punishment to the criminal conduct" in the juvenile context). M.S. is fortunate that he has already served out his disposition. Had the majority's new rule been in place when M.S.'s deferred disposition was revoked, M.S. could still be serving out sentences on the myriad assault and drug charges the State could have brought against him. Future juvenile offenders who act out in violation of their deferred dispositions may not be so lucky. I am left wondering how today's decision advances the fundamental fairness of juvenile justice proceedings.[7]

---

[7] Curiously, today's majority renders the juvenile justice system more rigid and punitive even while several of our recent cases have sought to make the adult criminal justice system more flexible when children are charged as adults. *See, e.g.*, *Ramos*, 187 Wn.2d at 428; *Houston-Sconiers*, 188 Wn.2d at 8; *Delbosque*, 195 Wn.2d at 121; *Ali* 196 Wn.2d at 225. This implicit tension suggests we must be careful not to blur the distinct criminal processes the legislature has established for juveniles and adults. *See S.J.C.*, 183 Wn.2d at 418 ("'If the formalities of the criminal adjudicative process are to be

23

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

III.    The Notice M.S. Received Was Constitutionally Sufficient

I would resolve this case simply by applying the primary precedent regarding notice requirements in juvenile justice proceedings: *Gault*, 387 U.S. 1.  There, the United States Supreme Court held due process requires that juvenile offenders receive notice of the charges against them "at the earliest practicable time."  *Id*. at 33.[8]  The purpose of such notice is to afford juvenile offenders a meaningful opportunity to prepare and present a defense to contest the charges against them.  *Id.* "Due process of law requires notice of the sort we have described—that is, notice which would be deemed constitutionally adequate in a civil or criminal proceeding." *Id.* at 33 & n.53 (citing *Cole v. Arkansas*, 333 U.S. 196, 201, 68 S. Ct. 514, 92 L. Ed. 644 (1948) ("No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused

---

superimposed upon the juvenile court system, there is little need for its separate existence.'" (quoting *McKeiver*, 403 U.S. at 551)).  While we must ensure both systems comply with constitutional requirements, we should avoid substituting our policy judgments for those of the legislature.

[8] *Gault*'s requirement that notice be given "at the earliest practicable time" suggests that the majority's new rule requiring notice at an entirely impractical time is not actually grounded in the requirements of fundamental fairness but rests, instead, on a faulty application of the *Apprendi* line of precedent.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

in a criminal proceeding in all courts, state or federal."); *Armstrong v. Manzo*, 380 U.S. 545, 550, 85 S. Ct. 1187, 1190, 14 L. Ed. 2d 62 (1965) ("'Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case'" (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313, 70 S. Ct. 652, 94 L. Ed. 865 (1950)))).

Taken together, these cases make clear that fundamental fairness in juvenile proceedings requires notice of the allegations against juvenile offenders at the earliest practicable time, such that they can prepare a defense ahead of a hearing on those allegations. That is precisely the nature of the notice M.S. received here.

The juvenile court repeatedly advised M.S. that violations of the conditions of his deferred disposition could result in revocation and the imposition of a manifest injustice sentence, first at his original disposition hearing and again at the hearing regarding his earliest violations. VRP (Jan. 3, 2018) at 13-14; *id.* (Mar. 22, 2018) 60-61. After M.S. continued to violate the conditions of his deferred disposition, the State notified M.S. and his attorney of its intent to request that the juvenile court revoke his deferred disposition and impose a manifest injustice disposition through

25

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

court filings that detailed M.S.'s various assaults, threats, and other misbehavior. CP at 73-115. M.S. and his attorney appeared at the revocation hearing, capably defending against the State's allegations and arguing for the imposition of a standard range disposition. VRP (Apr. 30, 2018) at 68-95; *id.* (May 8, 2018) at 96-162. At no time during that hearing did M.S. or his attorney claim they had not received adequate notice allowing them to prepare M.S.'s defense.

While M.S. did not receive notice of his specific postplea actions before he pleaded guilty—an impossibility—he was given clear preplea notice that future violations of the conditions of his deferred disposition could result in revocation of the deferral and the imposition of a manifest injustice disposition. After he committed such violations, M.S. was further notified that the State would seek revocation and a manifest injustice disposition based on specific facts detailed in court filings submitted in advance of the hearing in which M.S. and his attorney were able to present a defense. I would hold that this notice, which provided M.S. the opportunity to prepare and meet the allegations supporting a manifest injustice disposition at the revocation hearing, satisfied the due process requirements of fundamental fairness.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

The majority has only one direct criticism of my proposed rule: that it would somehow "remove[] information critical to the decision whether to accept a plea offer, plead guilty, or go to trial." Majority at 17. But that is simply false. No information is removed by requiring the juvenile court to advise a juvenile offender of the possibility that their actions between pleading guilty and their disposition hearing could support a manifest injustice disposition. Contrary to the majority's claims, the notice requirement I propose would give juveniles more information about the factors the juvenile court will consider at their disposition hearings.

The difference between the majority's position and mine is that the majority would require notice of s*pecific facts that do not yet exist*, while I would require notice of the p*ossibility that future facts could support a manifest injustice disposition*. The majority's rule is impossible to follow, and therefore completely bars juvenile courts from exercising their traditional discretion to consider "all relevant and material evidence" in disposition hearings. RCW 13.40.150(1). My rule would provide juvenile offenders with meaningful notice that will enable them to make informed decisions about whether to plead guilty, while maintaining the flexibility and discretion that has always distinguished the juvenile justice system

27

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

from the adult criminal justice system. These distinguishing characteristics must endure if we truly believe, as we have repeatedly held, that children are different.

CONCLUSION

The juvenile justice system requires flexibility in order to achieve its dual aims of punishment and rehabilitation. Today's majority undermines that flexibility by importing into juvenile justice proceedings a rigid due process requirement established in response to especially strict adult criminal laws that expose adult offenders to more severe ranges of punishment. Fundamental fairness does not require juvenile offenders be given preplea notice of events that have not yet happened but, instead, only notice "at the earliest practicable time," *Gault*, 387 U.S. at 33, of facts that will be considered at a disposition hearing. By eliminating the juvenile court's ability to fashion an appropriate disposition based on the juvenile's postplea actions, the majority increases the risk the juvenile will face additional criminal charges. Because this result is neither constitutionally compelled nor consonant with the goals and purpose of the JJA, I respectfully dissent from that portion of the majority opinion that rejects the juvenile court's discretion to take postplea facts into account when deciding whether to impose a manifest justice disposition.

28

*State v. M.S.*, No. 96894-2
(Stephens, J., concurring in part, dissenting in part)

_____
Stephens, J.

_____
Madsen, J.

_____
Yu, J.

_____
Whitener, J.